**PATTERSON–BALLAGH CORPORATION v. BYRON JACKSON CO.**

No. 10553.

Circuit Court of Appeals, Ninth Circuit.

Nov. 21, 1944.

See, also, 144 F.2d 766.

Musick, Burrell & Pinney, Howard Burrell, Anson B. Jackson, and Harold W.

Mattingly, all of Los Angeles, Cal., for appellant.

Donald Y. Lamont, of San Francisco, Cal., Leonard S. Lyon and Irwin L. Fuller, both of Los Angeles, Cal. (Chickering & Gregory, of San Francisco, Cal., and Lyon & Lyon, of Los Angeles, Cal., of counsel), for appellee.

Before GARRECHT, DENMAN, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

Appellant, Patterson-Ballagh Corporation, a California corporation, was sued by appellee, Byron Jackson Co., a Delaware corporation, in the District Court for royalties alleged to be due it under a patent license agreement. Diversity of citizenship was the basis of jurisdiction. Appellant's answer and amended answer denied that any royalties were due from it by reason of lack of consideration and failure of consideration for the patent license agreement. In addition, appellant asserted counterclaims for moneys paid by it to appellee as royalties under the agreement. The District Court, trying the case without jury, gave judgment for the appellee, from which judgment the appellant here appeals.

Appellant and appellee are both corporations engaged in the manufacture and sale of oil well drilling tools and supplies. The controversy here centers around arrangements made relative to the licensing of use of a patented device to protect the pipe used in drilling an oil well, and the casing which bounds the limits of the well hole.

In the drilling of oil wells the earth boring bit is attached to the lower end of a series of connecting length of pipe known as the drill string. The length of the drill string may reach to two miles or more. At such great lengths the heavy string of pipe becomes flexible and may weave about in the well bore so that the drill string strikes the sides of the well bore or casing. This results in the rapid deterioration of drill pipe at the points of contact. Also, when hard earth or rock makes progress slow, and friction against one point in the casing is long continued, a hole may be worn in the well casing.

Breakage of the drill string causes delay and expensive "fishing" operations to extricate the broken section and bit so that operations may continue. Holes worn in the casing may permit seepage of pro-

verbially unmixing water and so possibly necessitate the abandonment of the entire well.

Appellant, prior to the time of entering into the agreement here involved, acquired rights to a patent aimed at minimizing or eliminating this metal-to-metal friction of drill pipe and casing, with its attendant harmful effects. This device was the Bettis United States Patent No. 1,573,031. Its claims were directed to a rubber protector ring, somewhat larger in outside diameter than the coupling members which connect the sections of pipe. But, as it is important to note, the Bettis claims were limited to the use of such rings when positioned upon or applied to the drill pipe proper, rather than to the coupling units themselves.

Appellee, in 1928, acquired rights under Hopkins United States Patent No. 1,619,728. The Hopkins patent was directed to a special type of drill pipe coupling used to connect sections of a drill pipe string. One element of the patent claims was a rubber protector similar to that embodied in the Bettis patent. However, its use under the Hopkins patent was claimed not for the drill pipe body itself, but rather on an annular recess or groove on the peculiar drill pipe coupling.

We will return to the negotiations which occurred between the two competing corporations, but for the moment we pass them. On September 20, 1928, four agreements were entered into. The first two were between appellant and appellee; the last two between appellee on one side and C. L. Patterson and J. C. Ballagh on the other. These latter persons were at the time the beneficial owners of practically the entire issue of common stock in appellee corporation. The four agreements, hereinafter characterized respectively as A, B, C, and D, will be briefly summarized as to certain of their principal features.

Under A, appellee granted appellant an exclusive license under the Hopkins patent. Appellant agreed to pay appellee a royalty of 25 cents for every rubber ring manufactured by it, under both the Bettis patent, already controlled by appellant, and the Hopkins tool joint patent.

Under B, appellant relicensed to appellee the exclusive right to make and sell the metal part of the Hopkins tool joint device and to sell the patented coupling as a whole. In return, appellee agreed to buy

from appellant all the rubber rings it required for use in connection with the tool joint.

C was, as mentioned previously, a contract between appellee and Patterson and Ballagh individually. Under it appellee agreed to sell to the latter two a half interest in the Hopkins patent, in return for the first $75,000 allotted to it in royalties under contract A.

Under D, Patterson and Ballagh agreed to sell two hundred and fifty shares of appellant's stock—that is, one-quarter of the whole number—to appellee. Appellee agreed to purchase the stock at par, for a sum of $25,000.

The two companies, their fortunes now interwoven by this series of agreements, commenced to operate under the new arrangement. A Special Master, on October 23, 1929—in what proved to be the beginning of protracted litigation with the Oliver-Sherwood Company—held the Bettis patent to be invalid. It is stipulated that, presumably as a result of the adverse judicial decision, competitors of appellant, after January 1, 1932, were able to and did sell similar rubber rings freely.

Nevertheless, appellant continued to pay royalties. In 1938, the judgment of the District Court upholding the finding of the Special Master as to the invalidity of the Bettis patent was affirmed by this court in Oliver-Sherwood Company v. Patterson Ballagh Corp., 9 Cir., 95 F.2d 70. Royalty payments continued for approximately eighteen months longer. Shortly following a partial change of appellant's management, a notice of purported repudiation of contract A was given by appellant to appellee. This suit is a result of the refusal to pay royalties since July 1, 1939.

Appellant maintains that, as a consequence of either of two lines of reasoning, it is no longer obligated under the contract. First, it is contended that there was an initial lack of consideration for the agreements entered into which renders them unenforceable. Second, it is argued that, even if there be no initial lack of consideration, the declaration of invalidity of the Bettis patent, opening wide as it did the floodgates to competition in the well casing protector field, created a failure of consideration. It is said that the cessation of effective patent protection constituted a constructive eviction from the benefits of the contract which released appellant licensee from further obligations. Insofar as may be necessary, both these theories will be examined.

The initial contention is that there was originally no consideration for the granting of the Hopkins patent license given under contract A, since it granted nothing which the licensee did not already have. The right to place the protectors on the body of the pipe belonged already to the appellant under the Bettis patent. The right of sale for replacement on the Hopkins tool joint it also possessed under the law of patent repair.

Passing possible objections to so much of the argument as has been outlined, we conclude that it does not go far enough. The appellee quite clearly bound itself to purchase all its requirements of rubber rings for Hopkins tool joints from appellant. True, it bound itself to purchase no specified number of rings. Nevertheless, successful exploitation of its patent device, of which the rings were only a part and perhaps not the most important part, required it to purchase for each joint a rubber ring. By the terms of the license agreement it was obligated to purchase this ring from the appellant.

However, it is unnecessary to rest a conclusion that there was consideration initially on this ground. The trial court found that "Each of said four contracts * * * contains recitals and language linking all of them together," and that "All four of said contracts * * * constituted, and do now constitute, one and the same and but a single transaction."

The question whether a contract's provisions are entire or severable is a matter of the intention of the parties. Los Angeles Gas & Electric Co. v. Amalgamated Oil Co., 156 Cal. 776, 106 P. 55. And even though contracts separate in form are entered into, they are to be considered together if they are shown to be part of a single unified transaction. Mahana v. Los Angeles Engineering & Mfg. Co., 82 Cal.App. 710, 256 P. 279.

In this case the parties intended to settle no more than one comprehensive business deal, and the District Court correctly found that the four contracts under discussion constituted a single transaction —the granting of a license under the Hopkins patent, and a mutual adjustment of rights occasioned by the granting of that license. This is evidence, for instance, by

the references within the contracts to others of the four, by the manifest interrelationships of the specific subject matters, and, incidentally, by the fact that the contracts were all entered into at one time.

■ They are then to be considered together. The consideration given by appellee in these other contracts is sufficient to support the original royalty contract. For example, it was agreed under contract D that appellee should pay $25,000 for 250 shares of the stock of appellant. Under contract C it was agreed that appellee, on being allotted $75,000 in royalties under contract A, should transfer to Patterson and Ballagh individually a one-half interest in the Hopkins patent and assign to them also one-half the royalties thereafter accruing under A.

■ It is argued that these considerations were not given to the corporate appellant itself and so are insufficient. The California law is that detriment to the promisee is valid consideration. Bacon v. Grosse, 165 Cal. 481, 132 P. 1027; § 1605 California Civil Code. The corporation, beneficially owned and controlled by Patterson and Ballagh, bargained that certain moneys and certain rights should be transferred to its owners individually rather than to its corporate self. The moneys and rights were transferred as agreed. In this way appellee suffered as much detriment as though the corporation were the recipient—more, in a sense; for the appellee had become a one-fourth owner of appellant and would itself have benefited to that extent by payment to appellant itself instead of its owners.

We pass over other obligations incurred by appellees specifically in the four contracts and pass, temporarily, also possible further considerations not expressed on the face of the instruments. We return to this last topic during the discussion as to failure of consideration.

The other principal contention of appellant is that, even if it be said that there was no lack of consideration for the contracts in the first instance, this consideration virtually failed when there was an eviction from patent protection by reason of the holding of invalidity of the Bettis patent in the Oliver-Sherwood case, supra. In appellant's view, the agreement to pay royalties was based, if on anything, on the power of the Hopkins patent to shut out competition from any source. Because it developed that the arrangement entered into did not, by reason of the invalidity of appellant's own patent, afford the measure of protection which had been anticipated, we are asked to hold that appellant may repudiate the arrangement into which it entered.

It may be noted preliminarily that this was not the contemporaneous interpretation placed on the contract by appellant. The attempt to repudiate occurred only after royalties had been paid during a very considerable period of time, during which time it was probable or certain that appellant's patent arrangements had lost most or all of their exclusionary power.

■ Where there is a simple licensing agreement under a patent, and an ensuing judicial declaration of the patent's invalidity, or even a serious narrowing of the claims, it has been held that the licensee is released from further obligation to pay royalties. Drackett Chemical Co. v. Chamberlain Co., 6 Cir., 63 F.2d 853; Armstrong Co. v. Shell Co. of California, 98 Cal.App. 769, 277 P. 887. In such a case, the licensee pays simply for the continuing value of a license in enabling him to manufacture or sell goods on favorable terms; there being no other complications, it is a simple matter to release him from his obligation when the favorable terms bargained for cease to exist.

In this case the arrangement goes far beyond the one just described. It was not merely a right to use the patent that was granted here. As part of the same transaction, the licensor arranged a sale, not only of one-half the patent itself, but also of one-half the royalties to be paid it under the license. Further, the licensor purchased a one-fourth interest in the licensee. Thus the relationships of the parties were altered to an extent never contemplated nor attained by the typical license agreement; other considerations were given and others taken than the right to a patent's use and the royalties paid in return for that right. These other considerations remain though the patent protection is gone.

It is appellee's position that while the considerations apparent on the face of the four instruments are sufficient to sustain the continuing obligation to pay royalties, a principal consideration exists which is not made explicit in the instruments' words. This is said to be the removal of the dangerous threat posed to appellant's "substantial, profitable and lucrative business in the manufacture of these protector

rings," not only by the threat of competition with appellant's patent but also by the threat of patent infringement litigation.

Appellant objects strongly to the introduction of parol evidence to show this added consideration for the entrance into the contract. In this regard it epitomizes its position as follows: "Plaintiff cannot add nor inject into the formal contracts a new and different consideration than those therein expressed, by parol evidence; nor can the appellate court properly consider parol evidence in that regard, even though admitted without objection or contained in the stipulation of the parties."

■ It is, of course, elementary that parol evidence is not admissible to vary the terms of a complete written contract; but there are certain exceptions to that rule. In determining the extent of these exceptions we may look to the state law; and this is true whether such parol determination or explanation of the term of a contract be regarded as a matter of substance or of procedure only. If as one of substance, as was held in Long v. Morris, 3. Cir., 128 F.2d 653, 141 A.L.R. 1041, then under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, we are bound by the applicable state law, here California, in determining the admissibility of such evidence. If, on the other hand, the parol evidence rule is deemed merely adjective law, still state law is a permissible criterion of admissibility. Under Federal Rules of Civil Procedure, rule 43(a), 28 U.S.C.A. following section 723c, evidence is to be admitted which is admissible " * * * under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held."

■ Here it is contended by appellee that the major consideration for the entire four contracts was a compromise and settlement of the threats presented to appellant's business by the Hopkins patent. It is the California rule that the recital of consideration in a written instrument is not conclusive. Parol evidence is admissible under § 1962 of the Code of Civil Procedure to show the true consideration. Edmonds, J., speaking for the California Supreme Court in Shiver v. Liberty Building-Loan Ass'n, 16 Cal.2d 296, 106 P.2d 4, said: "It is elementary that the truth of the recital in a written instrument concerning the consideration is not conclusive, but that extrinsic evidence may be received to show the true consideration." See too Johnston v. Courtial, 216 Cal. 506, 14 P.2d 771.

Further, it is provided in § 1860 of the Code of Civil Procedure that "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

Interpretations of this section have not been uniform. However, the rule is stated in this way in the case of Lemm v. Stillwater Land & Cattle Co., 217 Cal. 474, 19 P.2d 785, 788: "In the interpretation of contracts, the duty of the court is to ascertain the intent of the parties. Although the language of the contract must govern its interpretation * * * nevertheless the meaning is to be obtained from the entire contract, and not from any one or more isolated portions thereof. * * * To assist it in the performance of this duty the court may look to the circumstances surrounding the parties at the time they contracted * * *, including the object, nature and subject-matter of the agreement * * * and the preliminary negotiations between the parties * * *, and thus place itself in the same situation in which the parties found themselves at the time of contracting."

■ Parol evidence then seems here to be admissible for the dual purpose of determining the true consideration and of placing the court "in the same situation in which the parties found themselves at the time of contracting."

Considering the evidence, it appears that one of the principal considerations for the agreements, so favorable in many ways to appellee, was the avoidance by appellant of appellee's possible competition and patent infringement suits.

Mr. Ballagh testified: " * * * one of the men in the field that I knew, that was either working for the U. S. Tool [a company predecessor in interest to appellee] or one of our salesmen, told me that the U. S. Tool had a patent on this, and they claimed that the patent might cause us some trouble * * * "

He testified further: "Our biggest fear —or my biggest fear was that this would be an outlet and means for anybody that

wanted to get around this patent, and the U. S. Tool Company were selling these rubbers at a price very considerably below our price, and we had no means that I knew of to stop them from doing it, because our attorney said under the Bettis patent it didn't apply if they put them on the tool joints."

The following appears in the stipulation of facts: " * * * Mr. Schurman suggested that it would be mutually advantageous if some deal would be made which would avoid unnecessary conflict and litigation between the owners of the Bettis and Hopkins patents. That plaintiff's representative, Mr. Schurman, stated to Mr. Ballagh that anyone selling rubber protector rings to be placed on tool joints would infringe the Hopkins patent; that if the defendant, Patterson-Ballagh Corporation, sold rubber protector rings to be placed on tool joints, Byron Jackson Pump Co. could sue Patterson-Ballagh Corporation for contributory infringement of the said Hopkins patent."

Appellant's primary objective in entering into these contracts, then, is seen to be not the desire to secure rights and make sales under the Hopkins patent. Instead, it sought especially to make a compromise, even if on somewhat unfavorable terms, that would eliminate the real or probable menaces of appellee's patent. This was what it sought, and this is what it secured. Patent litigation between the two parties was avoided; so, too, the danger of losing the top market position to appellee's rubber rings.

■■■■■ It is true that the turn of events has shown appellant's bargain to be a less successful one than it hoped for at the time of contracting; but this turn of events was not one either brought about or guaranteed against by appellee. Appellant contends additionally that the contract providing for sale of rubber rings by it to appellee is void for indefiniteness by reason of failure to provide a sales price for the rings or means for determining one. The California rule is to the contrary. In Great Western Distilling Products Co. v. J. A. Wathen D. Co., 10 Cal.2d 442, 74 P. 2d 745, 746, it is said: "The rule is that when no price is specified in a contract for the sale of goods, whether executory or executed, the price is supplied by the implication that a reasonable price is intended." And see California Civil Code § 1729.

Appellant is not entitled under the arguments and circumstances herein presented to cease paying, as provided by the contract into which it entered, a royalty of 25 cents on each well casing protector manufactured which embodies the claims of either the Hopkins or Bettis patents.

Under this view it becomes unnecessary to discuss appellant's counterclaim for royalties already paid.

The judgment is affirmed.