**PFOTZER et al. v. AQUA SYSTEMS, Inc., et al.**

No. 241, Docket 20557.

Circuit Court of Appeals, Second Circuit.

July 23, 1947.

Frederick W. P. Lorenzen and Dwight, Harris, Koegel & Caskey, all of New York City, (Caesar L. Pitassy, of New York City, of counsel), for appellants.

Louis J. Wolff and Menken, Ferguson & Idler, all of New York City, (John A. Hayes, Jr., of New York City, of counsel), for appellees.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This appeal is from a judgment for the defendants, entered upon the verdict of a jury in an action to recover treble damages for a conspiracy to violate §§ 1 and 2 of the Sherman Act.[1] The only points raised are errors alleged to have been committed by the judge during the course of the trial. The first and most important of these is his failure to charge the jury properly as to the rights of the plaintiffs and the liability of the defendants under the statutes involved. The next is his exclusion of the record of a conviction upon a plea of nolo contendere, offered to impeach the defendant, Kaestner, when he was upon the stand. The last was the exclusion of certain correspondence and documents to which the defendants were parties. We shall take up these in their order; but to the understanding of the case it is necessary to make some statement of the facts, as the evidence permitted the jury to find them.

The plaintiffs are partners in the general construction business, and were in 1940 more especially engaged in work for the United States Government. In July of that year, they entered into a contract with the "Bureau of Yards and Docks" of the Navy,

---

[1] §§ 1 and 2, Title 15 U.S.C.A.

to build a naval air station at Pensacola, Florida: a large job, part of which was a "hydraulic gasoline and oil distribution system." Such a distributing system depends upon the principle that gasoline, being lighter than water, will float upon the surface; and that it is therefore possible to use a tank containing both gasoline and water, forcing the gasoline out at the top by increasing the water pressure below, and filling gasoline in at the top by drawing water from the bottom. Such a system involves a number of valves, strainers, traps, lines and tanks and other apparatus, the details of which did not appear in the evidence and which it is not necessary to know. The Aqua Company was the patentee of a number of the parts which were necessary to the assembly; but, so far as we can gather, it had no patent upon the assembly as a whole. The defendant, Kaestner, implied as much in his testimony, although the system as a whole was at times referred to as a "patented system." On August 13, 1940, the plaintiffs asked both the Aqua Company and another corporation—Flotation Systems, Inc.,—to bid upon the materials and service necessary for the installation of such a system at Pensacola; and on the 15th, the Aqua Company did submit a bid of $6,573.00 for the "detailed plans, specifications, operating instructions," for the necessary "special parts,"—patented parts—and for the supervision of the installation of the system. The plaintiffs eventually accepted this bid, the defendants furnished the parts and did the work promised and the plaintiffs paid all but the last ten per cent of the agreed price. The action is to recover three times the difference between the amount so paid and the reasonable cost of the installing of the system, had the defendants not unlawfully restrained competition.

The Aqua Company was organized in 1925 and in 1928 took over the business of its only competitor at that time, the Farr Company, after which until 1938 there was no other company making a hydraulic gasoline distribution system. In that year or 1939 two other companies came into the field in California and combined to form the Flotation Company, just mentioned. On January 12, 1940, the Aqua Company and the Flotation Company made a contract the substance of which was as follows. In consideration of stipulated royalties and of the purchase of its patented parts and its services, the Aqua Company licensed the Flotation Company under thirty patents relating to the hydraulic system within "three territorial groups" of states. The Aqua Company promised not to license anyone else within "Group One," but reserved the right, not only to grant licenses in the other two "groups," but to compete with the Flotation Company in "Group One." In this competition it promised, however, "to quote and sell its patented systems and patented parts * * * at a figure not less than fifteen percent (15%) higher than the price which Flotation pays for said patented system and patented parts"; and to share the profits equally with the Flotation Company, if it made any contract at such an advance. The Flotation Company promised not to install any other system than the defendants', assembled with the patented parts; and not to manufacture the patented parts. "Group One" assigned to the Flotation Company consisted roughly of the Pacific Coast states; the rest of the country—except Alabama and Missouri—was reserved to the Aqua Company. The Flotation Company agreed to buy the patented parts at prices shown in two appended price lists—A and B—but it was free to buy unpatented parts where it pleased. If the Flotation Company bought "List A" parts, it would pay a royalty of one cent a gallon on the capacity of its storage tanks installed in "Group One"; one and one-half cents on those installed in "Group Two"; and two cents on those installed in "Group Three." If it bought "List B" parts, it would pay $500 as a royalty on each tank installed in "Group One"; $600, in "Group Two"; and $650, in "Group Three."

On August 16th, the Aqua Company, which had received the plaintiffs' request for a bid, wrote to the Flotation Company suggesting that it "should not quote"—to the plaintiffs—"less than $6800" for the patented parts necessary for the system, and concluding as follows: "for your information, Pfotzer did not get a price from us before he put his bid in and he was considerably low on the job. They, furthermore, do not

have a very strong credit rating and apparently lack working capital. On terms, therefore, I would quote them 25 per cent with the order, 50 per cent sight draft bill of lading, balance 30 days thereafter." The terms eventually agreed on between the Aqua Company and the plaintiff were considerably easier than these (10% on execution of the agreement, 40% on bills of lading, another 40% thirty days thereafter, and 10% on the completion of the whole job). On the other hand the Flotation Company on August 22nd, not only bid $7453. for the same work, but imposed as terms exactly those suggested by the Aqua Company By 1940 or 1941 the Aqua Company's system may have ceased to be the only hydraulic gasoline distribution system available; another and cheaper system was at least in experimental use, called the "Bowser" system. The differences between this system and the Aqua system the testimony did not clearly describe; apparently the principal one was in the position and electrical operation of the "shut-off valve." The plaintiffs submitted to the naval authorities an estimate of the cost of installing the "Bowser" system and sought to have it substituted; but they were unsuccessful, and on March 15, 1941, they entered into the contract with the Aqua Company.

On March 17, 1942, the grand jury for the Southern District of New York returned an indictment against the defendants and others, including the Flotation Company, charging them with a conspiracy to violate the Anti-Trust Acts; on December 9th of that year both defendants pleaded nolo contendere to this indictment, and the Aqua Company was fined $10,000, and Kaestner was fined $6,250. While Kaestner was on the stand, the plaintiffs offered the record of this prosecution to impeach his credibility; but the judge excluded it. The plaintiffs also offered in evidence the correspondence between one, Wrightson, who had charge of the installation of gasoline distribution systems for the Navy, and Kaestner, which, they argued, showed the intimacy of the two, and went to support an inference that the defendants had successfully induced Wrightson to insist upon the installation of their own distribution system. This the judge excluded. The plaintiffs also offered

in evidence a report, dated February 11, 1940 (the proper date would seem to have been 1941) from one, Sullivan, an employee, to Kaestner, indicating that Sullivan had been in communication with the naval authorities, and that they proposed to hold the plaintiffs strictly to their contract. It is possible to interpret this report as also showing that it was Sullivan who had prevailed upon the authorities to adopt this position. Part of this the judge admitted, part he excluded. Finally the judge excluded parts of the depositions of Kaestner, taken before trial.

On its main outlines the plaintiffs' case was two-fold: first, the Aqua Company had originally established a monopoly of all the producing capacity of hydraulic gasoline distribution, by buying out the Farr Company and later by making the contract with the Flotation Company. As corroborating evidence of this purpose they also depended upon the correspondence between Kaestner and Wrightson, the admissions in the report of Sullivan, and the Flotation Company's acceptance of the suggestion to overbid the Aqua Company's bid. Second, they argued that the contract with the Flotation Company was by its terms unlawful, because it restrained competition by what was in substance a division of territory. With this as a premise the plaintiffs say that the judge wholly failed properly to explain the law to the jury, or to make clear the issues upon which the case turned; and this is the first question to be considered. After some preliminary remarks which are not relevant, the judge stated: "Now, the gravamen of this action is that a monopoly existed. In consequence of that the plaintiffs were required by the specifications to install a system which could only be furnished by the defendant Aqua or Flotation." In this he was stating the plaintiffs' position; and he next stated the defendants': i.e. "that any of the parts required, or effective substitutes could be procured." Next he spoke of damages; and, as we understand him, on the theory that the Aqua Company's patents were relevant to the issue of damages, he mentioned § 68 of the Patent Law, 35 U. S.C.A., which allows the United States to use patented material and confines the patentee to a claim against the Treasury. He

called the jury's attention to the fact that the Navy Department had inserted a provision in the contract that the plaintiffs should hold the Government harmless for any infringement of its patent; but he added that the contract of the defendant corporation gave the plaintiffs a license under their patents. We are not clear that we understand this part of the charge and we speak of it principally because it introduced the only passage which can be thought to be an instruction upon the issue of monopoly, and which we quote in the margin.[2] This the judge immediately followed by the statement that a patent was a monopoly not condemned by the statute; and that "a patent license agreement is legal unless used to create a monopoly not embraced within the scope of the patent." He then told the jury to examine the details of the contract between the Aqua Company and the Flotation Company, "and say whether upon the facts in this case there is an expressed or a reasonable inferrable intent to create a monopoly." He concluded by reading § 1 of the Sherman Act and § 15 of the Clayton Act, 15 U.S.C.A. § 25.

▉ If the passage which we have quoted is to be understood as an instruction that the jury were to find the plaintiffs guilty of a monopoly, if they had acquired the kind of control which he there defined, we will not say that it might not have been adequate upon the issue of monopoly; and might not have justified the judge's refusal of those detailed requests which the plaintiffs asked him to make and which he refused. We are however left in doubt whether the passage should be so understood, occurring as it did in the midst of a discussion of patents as lawful monopolies. Upon hearing it in its context we should not have understood it as covering the plaintiffs' general claim of monopoly, but as confined to the defendants' misuse of their patents. Moreover, what took place later makes it clear that this is how the judge himself

understood them. After the jury had been out for a few hours, they came back and asked for "a copy of the applicable passage of the Sherman Anti-Trust Law and the Clayton Act." The judge again read § 1 of the Sherman Act, and § 1 of the Clayton Act, 15 U.S.C.A. § 12, as he had done before; and then the following colloquy took place: The plaintiffs' counsel said: "Your Honor, the complaint also claims the violation of Section 2 of the Sherman Act, the provision dealing with monopoly. I think the case was tried on the theory that that section may also have been violated here. The Court: I haven't heard anything about that in this case but I will read section 2 (examining)—no, I decline to read section 2 because section 2 as I read it is not pertinent here." Thereupon the jury retired, and after they had gone out the discussion shows that the judge supposed § 2 applied only to criminal prosecutions. Plainly he had never meant to leave to the jury the issue as to how far the Aqua Company had since 1928 gathered into its hands the construction of competing hydraulic gasoline distribution systems. The plaintiffs' requests, though by no means models, called his attention to this position clearly enough to require, if not his acceptance of their clumsy verbiage, at least some plainer statement of the issue than he had given.

▉ Moreover, whatever may be thought of the way in which the issue of monopoly was left to the jury that of "restraint of trade" was certainly inadequate, for to read the words of section one of the Sherman Act told the jury nothing. Even though we were to concede that what he had said just before doing so, was equivalent to saying that the contract between the Aqua Company and the Flotation Company was lawful unless the licensing provisions were meant "to create a monopoly," the instruction was nevertheless wrong, for the contract was unlawful on its face. As to "Group One" the Aqua Company promised

---

2 "Now you should apply in that respect the rule of reason whether the plaintiffs, as contracting engineers, exercised that degree of care and caution that would be expected of a reasonably prudent man under those circumstances, or whether they were precluded from

so doing by the existence of a monopoly which 'consists in the ownership or control of so large a part of the market supply or output of a given commodity as to stifle competition, restrict the freedom of commerce, and give the monopolist control over prices.'"

not only to add 15% to the prices which it charged the Flotation Company for the "patented system and patented parts"; but, if it got any contract in that "group" it agreed to divide the profits equally with the Flotation Company. This not only insured a margin of 15% to the Flotation Company, but, if that margin did not protect the Flotation Company against competition, gave it half the Aqua Company's profit, a damper upon that company's competition which might well prove effective. Conversely, the graduated royalties which the Flotation Company agreed to pay tended to confine it to "Group One," as the provisions just mentioned tended to confine the Aqua Company to "Groups Two and Three." There reciprocal promises show that the contract was meant to restrict the competition of each company to its own territory; and, while it did not—at least theoretically—set up impenetrable boundaries between the "groups,'" it was within the doctrine which first took express form in the Supreme Court in Addyston Pipe & Steel Co. v. United States: [3] i.e., that competitors may not divide between themselves the territory within which they would otherwise compete. The judge should not have left to the jury the issue whether the contract was unlawful, he should have charged them, as the plaintiffs asked him to do, that it was unlawful by its terms.

▆▆▆ The possession by the Aqua Company of patents upon some of the constituent parts was no excuse for the restrictions thus imposed. Indeed, these were not confined to the patented parts, for the Aqua Company promised to add 15% to the prices which the Flotation Company paid for the "patented system and patented parts," and the Flotation Company promised to pay royalties on the total gallonage of the tanks, or on each tank installed. However, it would not have made the least difference, if the restrictions had been limited to the patented parts. Its possession of the patents did not give the Aqua Company any immunity from § 1 of the Sherman Act, for it restricted its freedom to make and sell the patented articles and that freedom it derived from the common law, not from the patent law.[4] On the other hand, the power of the Aqua Company to compel the Flotation Company to pay graduated royalties cannot be based upon the fact that the installations of the Flotation Company were to contain patented parts. Once the Aqua Company had sold the parts, it lost all control over their disposition by the Flotation Company, and over any contract by which their price might be fixed in an installation.[5]

▆▆▆ The next alleged error is the exclusion of the record of the indictment against Kaestner and his sentence under the plea of nolo contendere, offered to impeach his cross-examination. We do not understand that the plaintiffs assert that this was admissible under § 5 of the Clayton Act;[6] plainly it was within the proviso, being a consent judgment entered before any testimony had been taken. Moreover, as a new question there is plausibility in the argument that the very purpose of the plea, nolo contendere, is limited to disposing of the prosecution in which it is entered; and that, just as it is not to be treated as an admission of the "operative" facts in another action, so it is not to be treated as an admission of facts which may impeach a witness in another action. Such indeed is the law of Massachusetts and of New Hampshire;[7] on the other hand in a number of jurisdictions it has been held that a conviction on such a plea is as competent to im-

[3] 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136.

[4] Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 34, 35, 43 S.Ct. 254, 67 L.Ed. 516.

[5] Bauer & Cie v. O'Donnell, 229 U.S. 1, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R. A.,N.S., 1185, Ann.Cas.1915A, 150; Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A.1917E, 1196, Ann.Cas.1918A, 955; Motion Pictures Patents Co. v. Universal Film Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann. Cas.1918A, 959; Boston Store of Chicago v. American Graphophone Co., 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551, Ann. Cas.1918C, 447.

[6] § 16, Title 15 U.S.C.A.

[7] Olszewski v. Goldberg, 223 Mass. 27, 111 N.E. 404; Karasek v. Backus, 293 Mass. 371, 199 N.E. 726; Collins v. Benson, 81 N.H. 10, 120 A. 724.

peach a witness as one entered on a plea of guilty or on a verdict.[8] We cannot see that the decision of the Court of Appeals of New York in People v. Daiboch,[9] has any bearing upon the question: true, the court there declared that a plea of nolo contendere —incidentally not known in New York—was not to be taken "as an admission of the facts alleged in the indictment" 265 N. Y. at page 129, 191 N.E. at page 860, but nobody has ever thought that it was. While there may be no logical basis for distinguishing between these two uses of the admission, logic has nothing to do with the doctrine anyway, because indubitably the plea does admit the facts and is intended to do so. The only relevant question is what are the limitations which the law assures the accused that he will be entitled to invoke, if he files the plea. That is a mere question of what the courts have decided—one alternative is no more rational than the other—and, so far as we can see, the greater number of jurisdictions allow the conviction as evidence to impeach a witness. Where there is a doubt as to the competency of evidence, Federal Rules of Civil Procedure, rule 43(a), 28 U.S.C.A. following section 723c, admonishes us to admit it rather than to exclude it; and for that reason we think it should have been here admitted. In all such cases there is of course the danger that the jury will use the plea as an admission of the "operative" facts; but that is equally true of a conviction on a plea of guilty or on a verdict. Whether the attempt is ever practicable to limit its use to the witness's credibility, and whether, if not, its use is an injustice, are not open questions for us.

■■ There remains only the competency of the other documents which the judge excluded. The correspondence between Kaestner and Wrightson, coupled with the Sullivan report, were rationally relevant to the question whether Kaestner and the Aqua Company were trying to influence the naval authorities to keep out any other hydraulic gasoline distribution systems. It was not necessary to prove that there was any corrupt bargain between them; it was enough, if the correspondence threw light upon the efforts of the Aqua Company, and served to prove they had acquired control, and meant to keep it. That made the correspondence admissible on the issue of monopoly. The deposition of Kaestner taken before the trial was admissible as evidence: in chief, if Kaestner was an officer of the Aqua Company when it was taken (Rule 26 (d) (2)); and in any event, to contradict his testimony on the stand (Rule 26(d) (1)).

There was some evidence of damages.

Judgment reversed; new trial ordered.

---

[8] Fisher v. United States, 1 Cir., 8 F.2d 978; State v. Herlihy, 102 Me. 310, 66 A. 643; State v. Conway, 20 R.I. 270, 38 A. 656; State v. Henson, 66 N. J.L. 601, 50 A. 468, 616; Hill v. Maxwell, 77 N.J.L. 766, 73 A. 501; State v. Radoff, 140 Wash. 202, 248 P. 405; State v. Evans, 145 Wash. 4, 258 P. 845; Haley v. Brady, 177 Wash.2d 775, 137 P.2d 505, 146 A.L.R. 859.

[9] 265 N.Y. 125, 191 N.E. 859.