**DALLAS COUNTY, Appellant,**

v.

**COMMERCIAL UNION ASSURANCE COMPANY, Ltd., et al., Appellees.**

No. 18217.

United States Court of Appeals
Fifth Circuit.

Jan. 17, 1961.

William McLean Pitts, T. G. Gayle, J. E. Wilkinson, Jr., Selma, Ala., for appellant.

J. S. Mead, Emmett R. Cox, Birmingham, Ala., John Randolph Smith, Selma, Ala. (Mead & Norman, Birmingham, Ala., of counsel), for appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

■ This appeal presents a single question—the admissibility in evidence of a newspaper to show that the Dallas County Courthouse in Selma, Alabama, was damaged by fire in 1901. We hold that the newspaper was admissible, and affirm the judgment below.

On a bright, sunny morning, July 7, 1957, the clock tower of the Dallas County Courthouse at Selma, Alabama, commenced to lean, made loud cracking and popping noises, then fell, and telescoped into the courtroom. Fortunately, the collapse of the tower took place on a Sunday morning; no one was injured, but damage to the courthouse exceeded $100,-000. An examination of the tower debris showed the presence of charcoal and charred timbers. The State Toxicologist, called in by Dallas County, reported the char was evidence that lightning struck the courthouse. Later, several residents of Selma reported that a bolt of lightning struck the courthouse July 2, 1957. On this information, Dallas County concluded that a lightning bolt had hit the building causing the collapse of the clock tower five days later. Dallas County carried insurance for loss to its courthouse caused by fire or lightning. The insurers' engineers and investigators found that the courthouse collapsed of its own weight. They reported that the courthouse had not been struck by lightning; that lightning could not have caused the collapse of the tower; that the collapse of the tower was caused by structural weaknesses attributable to a faulty design, poor construction, gradual deterioration of the structure, and overloading brought about by remodeling and the re-cent installation of an air-conditioning system, part of which was constructed over the courtroom trusses. In their opinion, the char was the result of a fire in the courthouse tower and roof that must have occurred many, many years before July 2, 1957. The insurers denied liability.

The County sued its insurers in the Circuit Court of Dallas County. As many of the suits as could be removed, seven, were removed to the United States District Court for the Southern District of Alabama, and were consolidated for trial. The case went to the jury on one issue: did lightning cause the collapse of the clock tower?

■ The record contains ample evidence to support a jury verdict either way. The County produced witnesses who testified they saw lightning strike the clock tower; the insurers produced witnesses who testified an examination of the debris showed that lightning did not strike the clock tower. Some witnesses said the char was fresh and smelled smoky; other witnesses said it was obviously old and had no fresh smoky smell at all. Both sides presented a great mass of engineering testimony bearing on the design, construction, overload or lack of overload. All of this was for the jury to evaluate. The jury chose to believe the insurers' witnesses and brought in a verdict for the defendants.

During the trial the defendants introduced a copy of the Morning Times of Selma for June 9, 1901. This issue carried an unsigned article describing a fire that occurred at two in the morning of June 9, 1901, while the courthouse was still under construction. The article stated, in part: "The unfinished dome of the County's new courthouse was in flames at the top, and * *. * soon fell in. The fire was soon under control and the main building was saved. * * * " The insurers do not contend that the collapse of the tower resulted from unsound charred timbers used in the repair of the building after the fire; they offered the newspaper account to show there had been a fire long before 1957 that would

account for charred timber in the clock tower.

As a predicate for introducing the newspaper in evidence, the defendants called to the stand the editor of the Selma Times-Journal who testified that his publishing company maintains archives of the published issues of the Times-Journal and of the Morning Times, its predecessor, and that the archives contain the issue of the Morning Times of Selma for June 9, 1901, offered in evidence. The plaintiff objected that the newspaper article was hearsay; that it was not a business record nor an ancient document, nor was it admissible under any recognized exception to the hearsay doctrine. The trial judge admitted the newspaper as part of the records of the Selma Times-Journal. The sole error Dallas County specifies on appeal is the admission of the newspaper in evidence.

 In the Anglo-American adversary system of law, courts usually will not admit evidence unless its accuracy and trustworthiness may be tested by cross-examination. Here, therefore, the plaintiff argues that the newspaper should not be admitted: "You cannot cross-examine a newspaper."[1] Of

1. This argument, a familiar one, rests on a misunderstanding of the origin and the nature of the hearsay rule. The rule is not an ancient principle of English law recognized at Runnymede. And, gone is its odor of sanctity.

Wigmore is often quoted for the statement that "cross-examination is beyond any doubt the greatest legal engine ever invented for the discovery of the truth". 5 Wigmore § 1367 (3rd ed.). In over 1200 pages devoted to the hearsay rule, however, he makes it very clear that: "[T]he rule aims to insist on testing all statements by cross-examination, *if they can be.* * * * No one could defend a rule which pronounced that all statements thus untested are worthless; for all historical truth is based on un-cross-examined assertions; and every day's experience of life gives denial to such an exaggeration. What the Hearsay Rule implies—and with profound verity—is that all testimonial assertions *ought to be* tested by cross-examination, as the best attainable measure; and it should not be burdened with the pedantic implication that they must be rejected as worthless if the test is unavailable." 1 Wigmore § 8c. In this connection see Falknor, The Hearsay Rule and Its Exceptions, 2 UCLA L.Rev. 43 (1954).

In The Introductory Note to Chapter VI, Hearsay Evidence, American Law Institute, Model Code of Evidence (1942), Edmund M. Morgan, Reporter, it is pointed out that "the hearsay rule is the child of the adversary system". The Note continues: "During the first centuries of the jury system, the jury based its decision upon what the jurors themselves knew of the matter in dispute and what they learned through the words of their fathers and through such words of these persons whom they are bound to trust as worthy. * * * Until the end of the sixteenth century hearsay was received without question. * * * The opportunity for cross-examination is not a necessary element of a jury system, while it is the very heart of the adversary system. * * * As the judges began their attempts to rationalize the results of the decisions dealing with evidence, they first relied upon the general notion that a party was obliged to produce the best evidence available, but no more. Had they applied this generally, hearsay would have been received whenever better evidence could not be obtained. Therefore the judges discovered a special sort of necessity in * * * exceptional cases * * * [making] the admissible hearsay less unreliable than hearsay in general. * * * [By 1840] it became the fashion to attribute the exclusion of hearsay to the incapacity of the jury to evaluate, and in the development of exceptions to the rule, courts have doubtless been influenced by this notion. * * * Modern textwriters and judges have purported to find for each exception some sort of necessity for resort to hearsay and some condition attending the making of the excepted statement which will enable the jury to put a fair value upon it and will thus serve as a substitute for cross-examination. A careful examination of the eighteen or nineteen classes of utterances, each of which is now recognized as an exception to the hearsay rule by some respectable authority, will reveal that in many of them the necessity resolves itself into mere convenience and the substitute for cross-examination is imperceptible. * * * In most of the exceptions, however, the adversary theory is disregarded. There is nothing in any of the situations to warrant depriving the adversary of an opportunity to cross-examine; but those rationalizing the results purport to find some substi-

course, a newspaper article *is* hearsay, and in almost all circumstances is inadmissible.[2] However, the law governing hearsay is somewhat less than pellucid.[3] And, as with most rules, the hearsay rule is not absolute; it is replete with exceptions.[4] Witnesses die, documents are lost, deeds are destroyed, memories fade. All too often, primary evidence is not available and courts and lawyers must rely on secondary evidence.

Dallas County contends, first, that the hearsay rule is a matter of substance, not of procedure,[5] and, under

tute for cross-examination. In most instances one will look in vain for anything more than a situation in which an ordinary man making such a statement would positively desire to tell the truth; and in some the most that can be claimed is the absence of a motive to falsify." For the history of the rule see 5 Wigmore, Evidence, § 1364 (3rd ed.); 9 Holdsworth's History of English Law, 214 (1926).

2. "Printed books or publications are not received in courts of justice as evidence of any fact stated in them * * * [because] the statements made therein are not uttered under oath and no opportunity for cross-examination of their author is afforded. Under this rule, newspapers or newspaper articles are not ordinarily admissible. * * *" 20 Am.Jur. Evidence, § 964, p. 812 (1939). An examination of the cases cited in support of this statement and of cases cited in support of similar statements shows that they are distinguishable from the instant case in that the inadmissible newspapers were not "necessary" or "trustworthy", in the sense those terms are used in this opinion. In Montana Power Co. v. Federal Power Commission, 1950, 87 U.S.App.D.C. 316, 185 F.2d 491, 498, certiorari denied 1950, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683, the Court held that newspaper accounts describing the use of the Missouri River during the 19th century were admissible in evidence. The hearing, however, was an administrative proceeding under the Federal Power Act, 16 U.S.C.A. § 791a et seq. The Court said: "Where it is the best available evidence, as where the subject matter is beyond the recall of living witnesses, hearsay may be admitted even in judicial proceedings. * * * [H]istorical works * * * are admissible * * * in cases * * * which must delve into the relatively ancient and obscure origins * * *. And the same is true of newspaper accounts, which are among the source materials of history."

3. "The fact is, then, that the law governing hearsay today is a conglomeration of inconsistencies, developed as a result of conflicting theories. Refinements and qualifications within the exceptions only add to its irrationality. The courts by multiplying exceptions reveal their conviction that relevant hearsay evidence normally has real probative value, and is capable of valuation by a jury as well as by other triers of fact. This is further demonstrated by the majority view that inadmissible hearsay received without objection may be sufficient to sustain a verdict. Most statutes regulating procedure before administrative tribunals make hearsay admissible. And it is by no means clear that the administrative official ordinarily presiding at a hearing has more competence to value testimony than has a jury acting under the supervision of a judge. The number of cases tried before juries as compared with the number tried before judges without juries and before administrative tribunals, is small indeed." ALI Model Code of Evidence, p. 223 (1942).

4. McCormick, *Law of Evidence*, Title 9: The Hearsay Rule and Its Exceptions (especially Section 300, "Weaknesses of the Present Rules,") (1954 ed.); Rucker, The Twilight Zone of Hearsay, 9 Vand.L.Rev. 453 (1956); Morgan, Hearsay and Non-Hearsay, 48 Harv.L.Rev. 1138 (1935); McCormick, The Borderland of Hearsay, 39 Yale L.J. 489 (1930).

5. Dallas County analogizes the hearsay rule to such rules as the parol evidence rule (Patterson-Ballagh Corp. v. Byron Jackson Co., 9 Cir., 1944, 145 F.2d 786; Long v. Morris, 3 Cir., 1942, 128 F.2d 653, 141 A.L.R. 1041), privileges (Munzer v. Swedish American Line, D.C.S.D. N.Y.1940, 35 F.Supp. 493), conclusive presumptions (9 Wigmore, Evidence § 2492 (3rd ed. 1940)), and the doctrine of res ipsa loquitur (Hotel Dempsey Co. v. Teel, 5 Cir., 1942, 128 F.2d 673; Andruss v. Nieto, 9 Cir., 1940, 112 F.2d 250). The analogy is slight. These quasi-evidentiary rules express positive state policy that so far affects rights, using the "outcome-determinative" test (which we shall not quibble over here), as to require that they be followed by the federal court. Several federal courts have held that they are not compelled to follow the state rules on hearsay in diversity of citizenship litigation. Franzen v. E. I. Du Pont De Nemours & Co.,

Erie Railroad Co. v. Tompkins, 1937, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the issue for decision is controlled by the law of Alabama.[6] Monarch Insurance Company of Ohio v. Spach, 5 Cir., 1960, 281 F.2d 401, 408 holds otherwise. In Monarch, this Court held that admissibility of evidence is procedural, not substantive;[7] that an ex parte statement under oath, inadmissible under a Florida statute, F.S.A. § 92.33, was admissible in the trial of a diversity case in the federal courts in Florida. After a thorough review of the authorities, Judge Brown, for the Court, stated:

> "For the most part, however, rules of evidence relate to what lawyers have long thought of as procedure. This is attested by the presence of Rules 43 and 44 in the Federal Rules. The Rules Enabling Act denied the power of the Supreme Court in such Rules to affect substantive rights.

That the Supreme Court, after having this problem brought sharply to mind, thought it appropriate to include them is some considered evidence that with respect to *admissibility* at least, the subject was procedural. To the extent that the receipt of evidence pertains to a matter within the *procedural* competence of the Federal District Court, it is controlled by F.R.Civ.P. 43(a)."

We regard the newspaper in the instant case as on a par with the questioned statement in Monarch, and "within the *procedural* competence of the Federal District Court".

■ There are no cases clearly in point—at least none that we have found —in Alabama decisions,[8] in the decisions of other states, or in the federal decisions. We decide this case, therefore, on general principles of relevancy and materiality, guided, as in Monarch,[9] by

---

3 Cir., 1944, 146 F.2d 837; Aetna Life Ins. Co. v. McAdoo, 8 Cir., 1939, 106 F.2d 618. This Court has held that res gestae statements, inadmissible under state law, were admissible in the federal court. New York Life Ins. Co. v. Schlatter, 5 Cir., 1953, 203 F.2d 184. In general, see Joiner, Uniform Rules of Evidence for the Federal Courts, 20 F.R.D. 429, 435–39 (1957); Morgan, Rules of Evidence—Substantive or Procedural? 10 Vand.L.Rev. 467 (1957); Symposium, Federal Trials and the Erie Doctrine, 51 Nw.U.L.Rev. 338, 352–54 (1956); Callaghan and Ferguson, Evidence and the New Federal Rules of Civil Procedure, 45 Yale L.J. 622, 641–44 (1936), 47 Yale L.J. 194 (1937); 5 Moore, Fed.Practice ¶ 43.02(a).

6. If state law were controlling, the Court's divining powers would be severely tested. The appellant cites no Alabama statute and only one Alabama decision, Aiken v. McMillan, 1925, 213 Ala. 494, 106 So. 150. That decision concerned the admissibility of the translation of a foreign document as the source of title. Neither the original nor a copy of the original was offered in evidence; the translation was not of any particular book, record, or paper authorized by law to be kept; the authenticity depended upon the unverified certificate of a person whose official identity was not shown, and who, so far as the record discloses, was not a public official or public translator; there was no official seal nor evidence by certificate or otherwise of what the paper purported to translate.

7. "[F]or the most part rules of evidence are thought of as procedural in the traditional conflict of laws sense." But, "they can be substantive * * * [when, as in Willitt v. Purvis, 5 Cir., 1960, 276 F.2d 129, they] represent local policy on a level more fundamental than the regulation of remedy or practice as such." Monarch Insurance Co. of Ohio v. Spach, 5 Cir., 1960, 281 F.2d 401, 408.

8. See footnotes 2 and 6. Absent Alabama decisions, the distinction between substantive law and procedural law loses its sting.

9. In Monarch, as in the instant case, the Court could find (1) no federal statute, (2) no equity practice (rule or decision), and (3) no state statute (rule or common law decision) specifically allowing the introduction in evidence of an ex parte statement. The instant case is stronger than Monarch, since in that case the Court was willing to assume that the ex parte statement was inadmissible under the Florida statute. The Court, however, postulated: "[T]urning back the clock to pre-1938, can there be any doubt that a federal equity Chancellor would have held this evidence admissible?"

the liberal language of Rule 43(a), F.R. Civ.P. 28 U.S.C.A.[10] Rule 43(a) provides:

"All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made."

Thus, "in a federal court, the rule, whether federal or state, which favors the reception of the evidence governs". New York Life Ins. Co. v. Schlatter et al., 5 Cir., 1953, 203 F.2d 184, 188.

▆▆▆▆ Rule 43(a) affirmatively expands the scope of admissibility. It is a rule of admissibility, not exclusion. Although the rule specifies three categories of evidence that shall be admitted, it does not prohibit the receipt of probative evidence outside the three categories. So, this Court said in Monarch: "[The rule] defines the three standards of admissibility. But it does not purport to prohibit the admission of other relevant material probative evidence which, in the considered exercise of judicial wisdom, is trustworthy. * * * [I]n today's litigation with its endless complexities many of which are an outgrowth of our scientific age we would hardly think that a court instituted with all of the power the organic constitution could invest in it would have to stand helpless in the face of a new situation." Even if Rule 43(a) should be interpreted as carrying the necessary implication that evidence to be admissible must fit into one of the three categories specified in the rule,[11] the cryptic reference to "rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity" is so uncertain in its meaning [12] as to give broad latitude to a trial judge in his rulings on admissibility. The trial judge may exercise his discretion, if he keeps the hearing within reasonable bounds. In finding and applying rules of evidence applicable to hearings of

10. "However, as inadequate as Rule 43 (a) is, it furnishes possibilities for progressive rulings which the courts have not fully exploited. * * * If gaps are left by an absence of decisions in the particular jurisdiction the federal courts can decide for themselves what the law is." Green, Federal Civil Procedure Rule 43(a), 5 Vand.L.Rev. 560, 565; citing Huddleston v. Dwyer, 1944, 322 U.S. 232, 64 S.Ct. 1015, 88 L.Ed. 1246; Michigan Central R. R. Co. v. Powers, 1906, 201 U.S. 245, 291, 26 S.Ct. 459, 50 L.Ed. 744; Holtzoff, New Federal Procedure and the Courts 120 (1940); cf. Peoples Loan & Investment Co. v. Travelers Ins. Co., 8 Cir., 1945, 151 F.2d 437, 441; Lake Shore Nat. Bank v. Bellanca Aircraft Corporation, D.C.D.Del.1949, 83 F.Supp. 795. "If there are no federal decisions directly in point the court could have adopted as the rule in the national tribunals the principle considered sound * * * citing federal cases which say that evidence can be admitted in the absence of federal precedents excluding [Peoples Loan & Investment Co. v. Travelers Ins. Co., 8 Cir., 1945, 151 F. 2d 437], that the Rules of Civil Procedure have attempted to liberalize admissibility [Mattox v. News Syndicate Co., 2 Cir., 1949, 176 F.2d 897 [12 A.L.R.2d 988]; Dellfield [Dellefield] v. Blockdel Realty Co., 2 Cir., 1942, 128 F.2d 85, 93], that when in doubt the ruling should be in favor of admissibility [Pfotzer v. Acqua Systems, 2 Cir., 1947, 162 F.2d 779]". Id. at page 567.

11. Wigmore, Evidence, § 6c, p. 201 (3rd ed.); 5 Moore, Federal Practice § 43.02 [3, 4].

12. There are few equity decisions on evidence and there is no body of law "heretofore applied in the courts of the United States" dealing with the admissibility of evidence in equity hearings. Wigmore asks: "Where are these rules to be found? How vain will be the search for them has been shown, ante § 6." 1 Wigmore, Evidence § 6c, pp. 170,201. (3rd ed.). See 5 Moore, Federal Practice § 43.02 [1], p. 1305; § 43.02 [3], p. 1313; § 43.04, p. 1325.

suits in equity, his chief censor is the conscience of a Chancellor.

If they are worth their salt, evidentiary rules are to aid the search for truth. Rule 43(a), notwithstanding its shortcomings, carries out that purpose by enabling federal courts to apply a liberal, flexible rule for the admissibility of evidence, unencumbered by common law archaisms.[13]

We turn now to a case, decided long before the Federal Rules were adopted, in which the court used an approach we consider appropriate for the solution of the problem before us. G. & C. Merriam Co. v. Syndicate Pub. Co., 2 Cir., 1913, 207 F. 515, 518, concerned a controversy between dictionary publishers over the use of the title "Webster's Dictionary" when the defendant's dictionary allegedly was not based upon Webster's dictionary at all. The bone of contention was whether a statement in the preface to the dictionary was admissible as evidence of the facts it recited. Ogilvie, the compiler of the dictionary, stated in his preface that he used Webster's Dictionary as the basis for his own publication. The dictionary, with its preface, was published in 1850, sixty-three years before the trial of the case. Ogilvie's published statement was challenged as hearsay. Judge Learned Hand, then a district judge, unable, as we are here, to find a case in point, for authority relied solely on Wigmore on Evidence (then a recent publication), particularly on Wigmore's analysis that "the requisites of an exception to the hearsay rule are necessity and circumstantial guaranty of trustworthiness". Wigmore on Evidence, §§ 1421, 1422, 1690 (1st ed. 1913).[14] Applying these criteria, Judge Hand held that the statement was admissible as an exception to the hearsay rule:

"Ogilvie's preface is of course an unsworn statement and as such only hearsay testimony, which may be admitted only as an exception to the general rule. The question is whether there is such an exception. I have been unable to find any express authority in point and must decide the question upon principle. In the first place, I think it fair to insist that to reject such a statement is to refuse evidence about the truth of which no reasonable person should have any doubt whatever, because it fulfills both the requisites of an exception to the hearsay rule, necessity and circumstantial guaranty of trustworthiness. Wigmore, §§ 1421, 1422, 1690, * * * Besides Ogil-

13. Rule 43(a) was a result of "dissatisfaction with the technical rule of the common law induc[ing] a desire to break-away from judicial shackles and instill a spirit of liberality in the field of evidence. * * * *" Conrad, Let's Weigh Rule 43(a), 38 Va.L.Rev. 985, 987 (1952). Judge Charles E. Clark says that Rule 43(a) has "set the federal trend toward generous admissibility" (citing Pfotzer v. Aqua Systems, 2 Cir., 162 F.2d 779, 785; Vanadium Corp. of America v. Fidelity & Dep. Co. of Maryland, 2 Cir., 159 F.2d 105, 109; Commercial Banking Corp. v. Martel, 2 Cir., 123 F.2d 846). Reck v. Pacific-Atlantic S.S. Co., 2 Cir., 1950, 180 F.2d 866, 869. See, too, Clark, Foreword to Symposium on the Uniform Rules of Evidence, 10 Rutgers L.Rev. 479, 482 (1956). In the first edition of his treatise on Federal Practice, Professor Moore stated: "But it is subdivision (a) of Rule 43 that revolutionizes federal evidence, and in general places admissibility upon the sole basis of relevancy and materiality." In the current edition he observed: "Despite the fact that his [the author's] hopes have been too sanguine, Rule 43 has worked tolerably well." 5 Moore, Federal Practice § 43.02 [3], p. 1313. See, in general, Joiner, Uniform Rules of Evidence for the Federal Courts, 20 F.R.D. 429 (1957); Owens, History and Application of Rule 43(a), 30 Texas L.Rev. 350 (1952); Pugh, Rule 43(a), 7 Vand. L.Rev. 356 (1954); Estes, The Need for Uniform Rules of Evidence in the Federal Courts, 24 F.R.D. 331 (1960); Degnan, The Feasibility of Rules of Evidence in Federal Courts, 24 F.R.D. 341 (1960). But see Green, Federal Procedure Rule 43(a), 5 Vand.L.Rev. 560, 580 (1952); Green, Admissibility of Evidence Under the Federal Rules, 55 Harv. L.Rev. 197 (1941); Thompson, Federal Rule 43(a)—A Decadent Decade, 34 Corn.L.Q. 258 (1948).

14. These sections remained virtually unchanged in succeeding editions.

vie, everyone else is dead who ever knew anything about the matter and could intelligently tell us what the fact is. * * * As to the trustworthiness of the testimony, it has the guaranty of the occasion, at which there was no motive for fabrication." 207 F. 515, 518.

The Court of Appeals adopted the district court's opinion in its entirety.

■■■■■ The first of the two requisites is necessity. As to necessity, Wigmore points out this requisite means that unless the hearsay statement is admitted, the facts it brings out may otherwise be lost, either because the person whose assertion is offered may be dead or unavailable, or because the assertion is of such a nature that one could not expect to obtain evidence of the same value from the same person or from other sources. Wigmore, § 1421 (3rd ed.). "In effect, Wigmore says that, as the word necessity is here used, it is not to be interpreted as uniformly demanding a showing of total inaccessibility of firsthand evidence as a condition precedent to the acceptance of a particular piece of hearsay, but that necessity exists where otherwise great practical inconvenience would be experienced in making the desired proof. (Wigmore, 3rd Ed., Vol. V, sec. 1421; Vol. VI, sec. 1702). * * * If it were otherwise, the result would be that the exception created to the hearsay rule would thereby be mostly, if not completely, destroyed." United States v. Aluminum Co. of America, D.C.1940, 35 F.Supp. 820, 823.

The fire referred to in the newspaper account occurred fifty-eight years before the trial of this case. Any witness who saw that fire with sufficient understanding to observe it and describe it accurately, would have been older than a young child at the time of the fire. We may reasonably assume that at the time of the trial he was either dead or his faculties were dimmed by the passage of fifty-eight years. It would have been burdensome, but not impossible, for the defendant to have discovered the name of the author of the article (although it had no by-line) and, perhaps, to have found an eye-witness to the fire. But it is improbable—so it seems to us—that any witness could have been found whose recollection would have been accurate at the time of the trial of this case. And it seems impossible that the testimony of any witness would have been as accurate and as reliable as the statement of facts in the contemporary newspaper article.[15]

The rationale behind the "ancient documents" exception is applicable here: after a long lapse of time, ordinary evidence regarding signatures or handwriting is virtually unavailable, and it is therefore permissible to resort to circumstantial evidence. Thus, in Trustees of German Township, Montgomery County v. Farmers & Citizens Savings Bank Co., Ohio Com.Pl.1953, 113 N.E.2d 409, 412, affirmed Ohio App., 115 N.E.2d 690, the court admitted as ancient documents newspapers eighty years old containing notices of advertisements for bids relating to the town hall: "Such exhibits, by reason of age, alone, and unquestioned authenticity, qualify as ancient documents?"[16] The ancient documents rule applies to documents a gen-

---

15. Cf. Rule 63(4) of the Uniform Rules of Evidence: "If the declarant is unavailable as a witness, a statement narrating, describing or explaining an event or condition which the judge finds was made by the declarant at a time when the matter had been recently perceived by him and while his recollection was clear, and was made in good faith prior to the commencement of the action [is admissible.]" Cf. also the Massachusetts Hearsay Act: "No declaration of a deceased person shall be excluded as evidence on the ground of its being hearsay if it appears to the satisfaction of the judge to have been made in good faith before the beginning of the suit and upon the personal knowledge of the declarant." Mass.Acts 1898, c. 535.

16. See also Wickes, "Ancient Documents and Hearsay," 8 Tex.L.Rev. 451 (1930); 7 Wigmore, Evidence, § 2137 (3rd ed.); McCormick, Evidence, §§ 190, 298 (1954 ed.).

eration or more in age. Here, the Selma Times-Journal article is almost two generations old. The principle of necessity, not requiring absolute impossibility or total inaccessibility of first-hand knowledge, is satisfied by the practicalities of the situation before us.

The second requisite for admission of hearsay evidence is trustworthiness. According to Wigmore, there are three sets of circumstances when hearsay is trustworthy enough to serve as a practicable substitute for the ordinary test of cross-examination: "Where the circumstances are such that a sincere and accurate statement would naturally be uttered, and no plan of falsification be formed; where, even though a desire to falsify might present itself, other considerations, such as the danger of easy detection or the fear of punishment, would probably counteract its force; where the statement was made under such conditions of publicity that an error, if it had occurred, would probably have been detected and corrected." 5 Wigmore, Evidence, § 1422 (3rd ed.) These circumstances fit the instant case.

There is no procedural canon against the exercise of common sense in deciding the admissibility of hearsay evidence.[17] In 1901 Selma, Alabama, was a small town. Taking a common sense view of this case, it is inconceivable to us that a newspaper reporter in a small town would report there was a fire in the dome of the new courthouse—if there had been no fire. He is without motive to falsify, and a false report would have subjected the newspaper and him to embarrassment in the community. The usual dangers inherent in hearsay evidence, such as lack of memory, faulty narration, intent to influence the court proceedings, and plain lack of truthfulness are not present here. To our minds, the article published in the Selma Morning-Times on the day of the fire is more reliable, more trustworthy, more competent evidence than the testimony of a witness called to the stand fifty-eight years later.

▬ We hold, that in matters of local interest, when the fact in question is of such a public nature it would be generally known throughout the community, and when the questioned fact occurred so long ago that the testimony of an eye-witness would probably be less trustworthy than a contemporary newspaper account, a federal court, under Rule 43(a), may relax the exclusionary rules to the extent of admitting the newspaper article in evidence. We do not characterize this newspaper as a "business record", nor as

---

17. Judge Parker observed in United States v. 25,406 Acres of Land, etc., 4 Cir., 1949, 172 F.2d 990, 995: "In cases of this sort, we must never forget that the common sense of the twelve men on the jury is a surer guaranty of justice than any attempt that might be made to give logical application to antiquated rules of evidence. If an honest and intelligent jury is given all the facts and is correctly instructed as to the law, it will come pretty near deciding a case correctly. Artificial rules of evidence which exclude from the consideration of the jurors matters which men consider in their everyday affairs hinder rather than help them at arriving at a just result." Judge Charles E. Clark, Chief Judge of the Second Circuit, the Reporter for the Advisory Committee on Rules for Civil Procedure, Supreme Court of the United States, has said: "I am convinced that judges generally have tended toward a pragmatic and common-sense attitude in the admission of evidence. They thus have already, with the exceptions noted, established the common-sense principle of Uniform Rule 7, which makes all evidence admissible unless otherwise expressly forbidden in the rules themselves." Clark, Foreword to Symposium on the Uniform Rules of Evidence, 10 Rutgers L.Rev. 479 (1956). Rule 7, Uniform Rules of Evidence (1953) reads, in part: "Except as otherwise provided in these Rules, * * * (f) all relevant evidence is admissible." See Jacobs, The Uniform Rules of Evidence, 10 Rutgers L.Rev. 484, 496 (1956). "Relevant evidence is defined in Rule 1 as 'evidence having any tendency in reason to prove any material fact'. Thus * * * the definition adopts Thayer's view [Thayer, Preliminary Treatise on Evidence 265 (1898)] that 'the law furnishes no test of relevancy'; it is an affair of logic, experience, and common sense, rather than of law." Falknor, Extrinsic Policies Affecting Admissibility, 10 Rutgers L.Rev. 574 (1956).

an "ancient document", nor as any other readily identifiable and happily tagged species of hearsay exception. It is admissible because it is necessary and trustworthy, relevant and material, and its admission is within the trial judge's exercise of discretion in holding the hearing within reasonable bounds.

Judgment is affirmed.