**STERLING NELSON & SONS, INC., a corporation, Plaintiff,**

v.

**RANGEN, INC., a corporation, Buhl Feed & Ice Company, a corporation, Elwood D. Grimes, Defendants.**

Civ. No. 3785.

United States District Court
D. Idaho.

Sept. 25, 1964.

Douglas Kramer, Twin Falls, Idaho, and Marvin J. Bertoch, Salt Lake City, Utah, for plaintiff.

Peter W. Billings, Salt Lake City, Utah, and John C. Hepworth, Buhl, Idaho, for defendants.

THOMPSON, District Judge.

The Court, having considered the evidence and the briefs and arguments of counsel, does hereby make the following Findings of Fact:

## FINDINGS OF FACT

1. Plaintiff is a corporation organized and existing under the laws of the State of Utah, with its principal place of business in Salt Lake City, Utah, and licensed to do business in the State of Idaho and various other States. Plaintiff is engaged in the manufacture and sale of fish food and other products in various States of the United States, including Idaho. Plaintiff competes with the defendant in the sale of fish food in several States, including the State of Idaho.

2. Defendant Rangen, Inc. is an Idaho corporation with its plant in Buhl, Idaho. It is engaged in the manufacture and sale of fish food and other products in various States of the United States, including Idaho. It purchases ingredients

for the manufacture of fish food in States other than Idaho, as well as Idaho, and sells fish food in various States, including the State of Idaho.

3. Buhl Feed and Ice Company, Inc., is merely a trade name of Rangen, Inc. under which Rangen, Inc. does business.

4. Defendant Elwood D. Grimes is a citizen and resident of the State of Idaho and was employed by the State of Idaho in the Department of Fish and Game from 1939 to June 1, 1962, first as a biologist and then, from approximately 1950, as the Superintendent of the State's fish hatchery at Hagerman, Idaho.

5. During the four years immediately prior to the commencement of this action, the State of Idaho paid Rangen, Inc. approximately $539,600 for fish food sold by Rangen, Inc. to the State of Idaho. During such period, Rangen, Inc. was, with insignificant exceptions, the sole supplier of fish food to the State of Idaho for consumption at state fish hatcheries. Realistically, the transactions between Rangen, Inc. and the State of Idaho were sales of processed fish food and not contracts for services. The proportion supplied by the State of the ingredients of the final product delivered was relatively insignificant, and this was done for the purpose of circumventing the State Purchasing Agent and of attempting to give to a purchase transaction the appearance of a contract for services.

6. Rangen, Inc., for the period December, 1955, to June, 1962, paid defendant Elwood Grimes the sum of $24,047.80. Payments by Rangen, Inc. to Grimes were not disclosed to anyone in the Department of Fish and Game nor to any other employee of the State of Idaho until they were discovered in February, 1962. Such payments were computed roughly but inaccurately as a percentage of gross sales of fish food made by Rangen, Inc. to customers other than the State of Idaho. During such period, defendant Elwood Grimes was the authority in the Idaho Department of Fish and Game with respect to the safe utilization and nutritional value of fish foods and with respect to fish food formulae. The payments made by Rangen, Inc. to Elwood D. Grimes were made for the purpose, at least in substantial part, of influencing Grimes' conduct as an employee of the State of Idaho with respect to recommendations of fish food products for purchase by the State of Idaho, and such payments were made pursuant to an understanding between Rangen, Inc. and Grimes that Grimes would use his best efforts to obtain for Rangen, Inc. the fish food business of the State of Idaho. Grimes did, in fact, influence the responsible officials of the State of Idaho to purchase substantially all its requirements of fish food from Rangen, Inc., and Grimes obstructed and impeded the testing of products of other possible suppliers, including plaintiff, and action on favorable reports of such tests.

7. At various times during the period preceding 1962, plaintiff solicited James C. Simpson, Chief of Fisheries Management, for the Idaho Department of Fish and Game, and other officials and employees of the State of Idaho, to purchase plaintiff's fish food, but James C. Simpson refused to accept plaintiff's offers to sell fish food to the State of Idaho and the State of Idaho failed to purchase any fish food from plaintiff during the four years immediately preceding the commencement of this action. The State of Idaho was not bound by any contract to purchase fish food from defendant Rangen, Inc. during the four years immediately preceding the commencement of this action, and during that period, could have at any time purchased fish food from any other source, including plaintiff. The State commenced to purchase fish food from other sources in 1962 on public bids under the State purchasing procedures, after disclosure of the payments by Rangen, Inc. to Grimes. Plaintiff was the successful bidder on the first of such public offers for bids. The fish food offered for sale by plaintiff had been experimentally tested in 1958 and found suitable and substantially equal in grade and quality to that sold by Rangen, Inc. Grimes, in 1957, refused to test plaintiff's product.

8. There were approximately eight companies, including defendant Rangen, Inc. and plaintiff Nelson & Sons, in competition with each other in the production and sale of fish food in the western states during all or part of the four year period prior to July, 1962. Four companies, including plaintiff and defendant Rangen, Inc., made offers or bids to supply the State of Idaho fish food requirements when the State first advertised for public offers in 1962. During the four year period immediately prior to July, 1962, the State of Idaho paid Rangen, Inc. approximately $539,600 for fish food sold by Rangen, Inc. to the State of Idaho. During such four year period, as a direct and proximate consequence of the wrongful conduct of defendant Rangen, Inc. and defendant Grimes, as aforesaid, plaintiff was precluded from an opportunity to bid to supply the fish food requirements of the State of Idaho and to make interstate sales of its products to the State of Idaho. It is reasonably and conservatively probable that plaintiff Sterling Nelson & Sons, Inc. would have sold to the State of Idaho approximately one-fourth of its fish food requirements, representing gross sales at plaintiff's prices (Ex. 20) of approximately $126,000 during such four year period if there had existed a competitive market unaffected by the wrongful and restraining conduct of defendants. It is reasonably probable that plaintiff would have realized a net profit of approximately fifteen per cent on the gross sales. Plaintiff was damaged by defendants' wrongful conduct in the amount of $18,900.

## CONCLUSIONS OF LAW

As conclusions of law from the foregoing facts, the Court finds:

1. Defendant Rangen, Inc., while engaged in commerce, in the course of such commerce paid money as compensation to Elwood D. Grimes who was an agent and representative of and acting in behalf of the State of Idaho in connection with the sale by Rangen, Inc. and the purchase by the State of Idaho of processed fish food, in violation of 15 U.S.C. § 13(c).

2. Plaintiff, Sterling Nelson & Sons, Inc., was injured in its business by reason of the aforesaid violation of the antitrust laws and sustained damages in the amount of $18,900.

3. The actual damages should be trebled by virtue of the requirements of 15 U.S.C. RST, and plaintiff is entitled to judgment against defendants for $56,700, together with costs of suit and a reasonable attorney's fee in the amount of $7,500.

## OPINION

It is the opinion of the Court that the facts as proved and found establish a cause of action in plaintiff under 15 U.S.C. RST, which provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. Oct. 15, 1914, c. 323, § 4, 38 Stat. 731."

## ROBINSON-PATMAN ACT

### FIRST CAUSE OF ACTION

The first of the "antitrust laws" upon which plaintiff relies to sustain his suit is the Robinson-Patman Act (15 U.S.C. § 13), adopted in 1936 as an amendment to Section 2(c) of the Clayton Act. Plaintiff relies particularly on Section 13(c), which provides:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, repre-

sentative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

It is to be noted that each of the subdivisions of Section 13 deals, as did the original Section of the Clayton Act, with the subject of price discrimination. The amendments enacted in the Robinson-Patman Act spell out with greater particularity than was found in the original Clayton Act prohibitions of certain business practices which Congress defined as constituting unlawful price discrimination. Section 13(a) proscribes, in general terms, price discrimination between different purchasers where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly. Section 13(b) deals with the burden of proof and possible defenses if a price discrimination has been established. Section 13(c) proscribes the payment of a brokerage or commission to a person acting on behalf of or subject to the direct or indirect control of the other party. Section 13(d) proscribes side payments to a customer for services or facilities, such payments not being available on equal terms to all other customers. Section 13 (e) proscribes furnishing services or facilities to one purchaser which are not equally available to other purchasers. Section 13(f) proscribes a person engaged in commerce from receiving the benefit of a prohibited discrimination in price.

It is true that Section 13(c), upon which plaintiff specifically bases his first cause of action, does not, in terms, refer to price discrimination. Yet it could be interpreted in pari-materia with the whole section of which it is a part so as not to be considered an isolated definition of an unlawful trade practice apart from the concept of price discrimination to which it is in substance and by statutory context quite patently related.

Insofar as the payment of a brokerage or commission generally and without reference to the idea of price discrimination should be considered unlawful as a trade practice, this subject has been separately considered by Congress in the Federal Trade Commission Act (15 U.S. C. § 45).

In view of the foregoing, if this were a case of first impression, this Court would be inclined to hold that commercial bribery of the kind here involved was not intended to be included within the proscriptions of the Robinson-Patman amendments to Section 2(c) of the Clayton Act [15 U.S.C. § 13(c) ]. Plaintiff, however, has cited the decisions in Fitch v. Kentucky-Tennessee Light & Power Co. (6 CCA 1943), 136 F.2d 12, 149 A.L. R. 650, and Canadian Ingersoll-Rand Co. v. D. Loveman & Sons, Inc. (N.D.Ohio 1964), 227 F.Supp. 829, for the law to sustain its cause of action under the Robinson-Patman Act. In both cases, it was held that the buyer had a cause of action under Section 13(c) against a seller who had bribed the agent of the buyer. In discussing the contention that there was no price discrimination as such, the Court, in the Fitch case, said:

"Appellant argues that the Act is concerned only with price discriminations extended by sellers to different buyers; and that there is no proof that the seller in this case so discriminated. The fact is that the buyer is suing for damages, not because of receiving the benefit of discriminatory prices, but because, on account of the fraud, it was obliged to pay more for its coal than it would otherwise have paid in a competitive market. While various sections of the statute are concerned with price discrimination, we do not agree with the claim that the provisions of the Act are limited thereto.

"Under Sec. 13(c) (Title 15 U.S. C.A.), the granting of a commission to the agent of the other party to the transaction was specifically forbidden as an unfair trade practice because of its tendency to lessen competition and create monopoly. Oliver Bros. v. Federal Trade Commission,

4 Cir., 102 F.2d 763. The section deals with a trade practice which has frequently resulted in unfair competition. It deals with one particular subject, namely, allowances or brokerage of such a nature and kind that commerce, generally, is affected thereby; and it constitutes a specific prohibition of a specific act. Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 3 Cir., 106 F.2d 667, certiorari denied 308 U.S. 625, 60 S.Ct. 380, 84 L.Ed. 521. 'It is clear that the statute prohibits payment of brokerage by the seller to the buyer or his agent or representative or controlled intermediary except for services rendered.' Biddle Purchasing Co. v. Federal Trade Commission, 2 Cir., 96 F.2d 687, 691, certiorari denied 305 U.S. 634, 59 S.Ct. 101, 83 L.Ed. 407. 'It is plain enough that the paragraph, taken as a whole, is framed to prohibit the payment of brokerage in any guise by one party to the other, or the other's agent. * * * Paragraph (c) is a distinct and complete provision in itself making illegal the giving or taking of commissions or their equivalent under the circumstances mentioned in the text.' Quality Bakers of America v. Federal Trade Commission, 1 Cir., 114 F.2d 393, 398."

Assuming this to be so, who can take advantage of the violation of the Section? The Fitch and Canadian Ingersoll-Rand cases hold that the buyer, the cost to whom of the product sold was increased inferably by the amount of the bribe paid, has a cause of action for such damages. From one point of view, there was price discrimination here because, it may be argued, the buyer paid more for the product than others whose custom did not have to be induced by bribery. This, of course, is not necessarily so and more commonly the actual price to all customers might be the same and the seller employing commercial bribery where necessary would charge such costs to general overhead rather than to the specific sale.

Although both Fitch and Ingersoll-Rand may be rationalized as price discrimination cases inasmuch as the price to the particular buyer may have been greater than the price offered other buyers, the Sixth Circuit in the Fitch case, as the above quotation shows, preferred to consider Section 13(c) as an independent "maverick" prohibition of an unfair trade practice rather than as a provision which must be interpreted within the general concept of price discrimination. This accords with the specific language of the Section which itself makes no reference to price discrimination. The Supreme Court, by footnote comment in Federal Trade Commission v. Henry Broch & Co. (1960), 363 U.S. 166, 169, 80 S.Ct. 1158, 1161, 4 L.Ed.2d 1124, has inferentially approved the rationale of the Fitch case, stating, "And although not mentioned in the Committee Reports, the debates on the bill show clearly that § 2(c) was intended to proscribe *other practices* such as the 'bribing' of a seller's broker by the buyer." (Emphasis added). We, therefore, conclude that plaintiff has proved a cause of action under 15 U.S.C. § 13(c).

Section 13(c) applies to "any person engaged in commerce" who, "in the course of such commerce" pays "anything of value * * * to the other party * * * or to an agent, representative or other intermediary therein." We have found that Elwood Grimes was an influential employee of the State of Idaho who, for compensation paid, exerted such influence as he had to establish and preserve Rangen, Inc. as the exclusive source of supply for Idaho's fish food requirements. The evidence shows that both plaintiff, Nelson, and defendant Rangen, Inc. were engaged in interstate commerce as defined in the Act (15 U.S. C. § 12), selling their products throughout the Western States and on the Atlantic Seaboard in competition with each other and with other suppliers. True, the particular sales by Rangen to Idaho

were intrastate, but the impact of defendant's wrongful conduct was to prevent or impede an interstate negotiation and possible sale by plaintiff Nelson & Sons to Idaho and negotiations with and possible sales in interstate commerce by other out-of-State fish food producers.

Authorities in support of the statement, "[I]t is not enough * * * . that defendant be engaged in interstate commerce but it must also be shown that the sale complained of was one occurring in interstate commerce", are collected in Willard Dairy Corp. v. National Dairy Products Corp. (6 CCA 1962), 309 F.2d 943, cited by defendants. Plaintiff relies on Moore v. Mead's Fine Bread Co. (1954), 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145, and argues that it is not essential that the sale complained of be an interstate sale. The Willard Dairy case distinguished the Moore case with the statement, "In Moore * * * [the] purchases involved in the alleged discrimination were in interstate commerce and interstate sales of like grade and quality were discriminated against." But in Willard Dairy, the Court was careful to say that the situation there involved only intrastate sales, that is, sales in and around Willard, Ohio where the discriminatory price-cutting occurred in competition with plaintiff as compared with sales in and around Marion, Ohio—all from a production source in Ohio.

■ In its interstate aspect, our case is substantially different. Nelson & Sons competed with Rangen, Inc. throughout the several western states, including Idaho. Rangen's commercial bribery of an influential state employee imposed an obstacle to interstate trade more direct in its deleterious consequences upon interstate commerce than the price discrimination practiced in Moore v. Mead's Fine Bread. In Moore, the Supreme Court quoted the following from the Congressional debate:

"Where, however, a manufacturer sells to customers both within the State and beyond the State, he may not favor either to the disadvantage of the other; he may not use the privilege of interstate commerce to the injury of his local trade, nor may he favor his local trade to the injury of his interstate trade."

■ Having concluded that commercial bribery is abjured by the Robinson-Patman amendment to Section 2(c) of the Clayton Act, and that such bribery of a local, intra-state customer directly injured interstate trade, it follows, in the light of the Mead decision, that the actionable misconduct occurred "in the course of such commerce" within the intendment of 15 U.S.C. § 13(c). It is not required that the bribery be in connection with an interstate sale or transaction.

■ Defendants also argue that the anti-trust laws do not apply with respect to sales to a sovereign state. We do not agree. The only purpose of such an exception of which we can conceive is to preserve the right of a sovereign to purchase goods as cheaply as possible irrespective of the price to private customers. No problem of this sort is involved here. If we have correctly interpreted Section 13(c) as an express prohibition of commercial bribery, no reason occurs to us why such misconduct should not be actionable with respect to sales to a sovereign as well as sales to a private citizen or corporation. Compare: Union Carbide and Carbon Corporation v. Nisley (10 CCA 1962), 300 F.2d 561; Bankers Life & Casualty Co. v. Larson (5 CCA 1958), 257 F.2d 377; Pfotzer v. Aqua Systems (2 CCA 1947), 162 F.2d 779.

## SHERMAN ACT

### SECOND AND THIRD CAUSES OF ACTION

■ Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) respectively abjure combinations and conspiracies in restraint of trade or commerce and monopolization, attempts to monopolize and conspiracies to monopolize trade or commerce. Plaintiff has framed its second and third causes of action under these sections.

The evidence here proves only bribery of an influential state employee which had a detrimental restraining effect upon interstate commerce. This is not the type of misconduct within the purview of the concepts of a combination in restraint of trade or monopoly as used in the Sherman Act. This case falls within the principles found controlling in Parmelee Transportation Company v. Keeshin (7 CCA 1961), 292 F.2d 794, where the Court, in a situation of gross misuse of official influence for private gain, akin to bribery, said: "However, the use of conventional anti-trust language in drafting a complaint will not extend the reach of the Sherman Act to wrongs not germane to that act, even though such wrongs be actionable under state law." That Court quoted extensively from Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, in which the Supreme Court announced that the Sherman Act must be interpreted in the light of well understood common law doctrines relating to monopolies and restraints of trade such as contracts for the restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like. Nothing of that kind occurred here. This is a simple case of buying influence, sometimes called commercial bribery, which is cognizable under the anti-trust laws only because of the specific language of 15 U.S.C. § 13(c) and the judicial applications of the section we have noted. The case falls short of proving actionable wrongs under the Sherman Act. Cf. Norville v. Globe Oil & Refining Co. (7 CCA 1962), 303 F.2d 281.

## STATE LAW

### FOURTH CAUSE OF ACTION

Inasmuch as we have concluded that the misconduct of the defendants, who were engaged in commerce, occurred in the course of commerce, it is inappropriate and unnecessary to consider the application of Idaho's "Little Robinson-Patman Act" (Section 48–202, Idaho Code), and the Statute of Limitations problem under the state law.

## DAMAGES

The impossibility of proving damages with accuracy in this type of case has often been recognized. Defendants, of course, are correct in asserting that during the four year period prior to July, 1952, the only immediate and direct effect of defendants' misconduct was to deprive plaintiff of an opportunity to bid to supply the fish food requirements of the State of Idaho. In a sense, it is pure speculation to say that plaintiff would have obtained all or some part of the business if it had been permitted to compete therefor on equal terms with Rangen, Inc.

But this element of speculation is present in every effort to prove what might have been, rather than what was. The Courts can properly require only that plaintiff prove a reasonable probability of damage in a reasonably certain amount to justify recovery. Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Bigelow v. RKO Radio Pictures, 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Lessig v. Tidewater Oil Co. (9 CCA 1964), 327 F.2d 459; Richfield Oil Corporation v. Karseal Corporation (9 CCA 1959), 271 F.2d 709.

The evidence here demonstrates that plaintiff was damaged in its right to compete freely against Rangen, Inc. for the State of Idaho business. Between 1957 and 1962, plaintiff was actively seeking the Idaho business, as was J. R. Clark Co. and perhaps one other producer of fish food, by having tests conducted of the nutritional value of the respective formula foods, and by questing for entry to the Idaho market. When public offers were first solicited in 1962, four suppliers bid, including plaintiff and defendant Rangen, Inc., and plaintiff was successful. We view it as a reasonable and conservative inference from the evidence that plaintiff would, in all probability, have enjoyed one-fourth of the custom of the

State of Idaho on a free market. Plaintiff proved, as best it could under the circumstances, that its anticipated profit from gross sales was between 16.5% and 20%. Continuing a conservative approach, we have elected to use a percentage of anticipated profit from gross sales lost of fifteen per cent. In computing damages in this sort of situation, a Court or jury, in order to minimize the element of speculativeness inherent in the facts, need not adopt plaintiff's computation of damages but may award less. Such a lesser award still meets the legal requirement of being supported by the evidence. See: Richfield Oil Corporation v. Karseal Corporation, supra

### DECISION

Plaintiff should have judgment against defendants for actual damages of $18,900, trebled to $56,700, and for reasonable attorney fees in the amount of $7,500. Plaintiff's attorneys shall submit an appropriate form of Judgment.