**Roland WATERS et al., Plaintiffs,**

v.

**NATIONAL FARMERS ORGANIZA-TION, INCORPORATED,
Defendant.**

**No. IP 66–C–440.**

United States District Court,
S. D. Indiana,
Indianapolis Division.

June 23, 1971.

Lawrence McTurnan of Bredell, Martin & McTurnan, Indianapolis, Ind., for plaintiffs.

Alan W. Boyd, of Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., and Lee D. Sinclair, Washington, D. C., for defendant.

## MEMORANDUM ENTRY WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

STECKLER, Chief Judge.

This is a suit in three paragraphs for declaratory judgment in which the plaintiffs ask the Court to declare illegal and unenforceable certain collective bargaining contracts, so-called "master contracts," between the defendant, National Farmers Organization, Incorporated (hereinafter referred to as NFO), and processors of agricultural products, and certain membership agreements signed by the named plaintiffs and other members of NFO similarly situated. Upon such declaration plaintiffs ask the Court to restrain and enjoin NFO, its officers, agents, employees, and its members from directly or indirectly using such master contracts and membership agreements, as written.

The factual allegations of the amended complaint upon which the case was tried are, for the most part, undisputed.

The five plaintiffs are members of the defendant, a not-for-profit corporation originally organized under 28 Iowa Code Ann. Ch. 504. Subsequently, in December of 1968 the defendant elected to adopt the provisions of Chapter 504A of the Iowa Code. Each of the members, including plaintiffs, has signed an instrument denominated "Membership Agreement." Each agreement authorizes the defendant and its agents or representatives to act as the exclusive representative of the signing member in collective bargaining in respect to all commodities marketed from the member's farm not covered by other marketing agreements at the date of execution of the membership agreements, to enter into contracts with processors of such products covering the selling prices and other conditions of disposal, and to establish marketing procedures therefor. Such authorization is stated in the contracts to have been made pursuant to the provisions of the Capper-Volstead Act, 7 U.S.C. § 291, enacted February 18, 1922.

The membership agreement provides that no contract consummated with a processor shall be effective or binding unless ratified by a two-thirds vote of the members in the marketing area attending a meeting called for that purpose by the Market Area Bargaining Committee, and by defendant's National Board of Directors.

Under the membership agreement, until a master contract has been consummated with the processor, for a commodity which the member owns or controls, he is free to market his commodity as he chooses. After such a contract with a processor for the member's commodity has been consummated in accordance with the membership agreement, each member must sell to such processor or suffer a penalty.

Prior to the consummation of a master contract with a processor for the sale of his commodity, a member is required to pay dues of Five Dollars ($5.00) per year and is subject to an annual assessment of Twenty Dollars ($20.00) to be used as directed by the defendant's Board of Directors to defray expenses incurred in carrying out a program of effectuating collective bargaining with the processors and other activities in the best interests of the organization as determined by the Board of Directors. A consummated marketing contract covering a member's commodity is required to provide that the processor will deduct from the selling price and pay to defendant one percent (1%) of the gross sales of such member which will replace the dues and fees

prescribed for the period prior to such consummation. The membership agreement also provides that defendant shall not become legal owner or engage in business activities but must remain within the framework of a service organization bargaining for its members who have signed marketing contracts.

The Court found as stated in the accompanying findings of fact and conclusions of law that defendant is a corporate association of persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, etc. Under Section 1 of the Capper-Volstead Act, persons so engaged are authorized to act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Whether defendant is such an association within the meaning of 7 U.S. C. § 291 is challenged by Paragraph II of the amended complaint, but not by Paragraphs I or III. Article III of defendant's original Articles of Incorporation provided that its object and purposes should be to promote agricultural benefits to the farmers of the United States of America and to do any one or more or all of the acts, things and objects in any manner connected therewith or necessary, incidental, convenient or auxiliary thereto, including the promotion of ideas to increase the benefits and standard of living of the farm population.

In 1958 Article III was amended by adding Section 2 which provides:

"An object and purpose of this organization is to bargain collectively on a non-pecuniary basis as a service for its members for the sale of their agricultural commodities or any of them, the prices to be paid therefor and the terms and conditions governing the sale, delivery and payment therefor and all matters arising therefrom, in connection with or incidental thereto, but all such activities shall be conducted by the organization on a non-pecuniary basis, for the benefit of its members."

As a part of its function as such representative of its members in collective bargaining, defendant has entered and seeks to enter into master contracts with processors and buyers for the sale by its members of their agricultural products. The products with respect to which master contracts have been entered into and are sought to be entered into, are cattle, pork, soy beans, edible beans, milk to be used for Class I purposes and milk to be used for manufacturing purposes.

Each master contract provides that it will be activated only after certain specified conditions have been met. With respect to cattle, the tendered contract provides:

"This contract will not be activated until the NFO is marketing or is in the position to market under the Membership Agreement at least sixty percent (60%) of the total cattle slaughtered in the major cattle producing states of Illinois, Indiana, Iowa, Ohio, Michigan, Minnesota, Missouri, Wisconsin, Kansas, Nebraska, and Colorado."

The provision with respect to hogs is identical, with the omission of Colorado. The milk contracts provide that each contract shall be in full force and effect beginning thirty (30) days from the day that NFO advises the processor who has signed such a contract that processors who have contracted to bottle or bottled an amount of milk equal to sixty percent (60%) of the average number of pounds of milk bottled in Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, Iowa, Missouri, Kansas, and Nebraska, have signed like contracts. With respect to both types of beans, the volume requirement for activation of the master contracts is the entering into contracts with processors who have contracted to process or handle or who have in the past year processed or handled

an amount equal to sixty percent (60%) of the average amount of such beans processed or handled in the United States during the last three years.

Each master contract further provides that its execution by the Bargaining Committee of the marketing area involved and the commodity directors of NFO is "subject to ratification by members affected as provided in Article VI of the Membership Agreement," which, as previously stated, provides that no contract consummated with a processor shall be effective or binding until it has been ratified by a two-thirds vote of members in a marketing area who have signed contracts with NFO for the commodity, attending a meeting called for that purpose by the Marketing Area Bargaining Committee, and has been approved by the Board of Directors of NFO.

The first master contract forms were prepared in 1961 and 1962, and while NFO has sought to enter into such contracts since then, it has never to the present time been able to obtain a sufficient volume of master contracts or production to activate any master contract for any commodity, and the evidence in the trial failed to establish a basis for an estimate or even an educated guess as to when NFO will be in a position to activate any of such contracts.

Each master contract provides that the processor shall buy a specified quantity of the commodity involved during the 12-month period the contract is in effect (which is automatically renewed for further like periods unless either party gives notice by registered mail not less than sixty days before the end of said period of a desire to terminate) at specified prices which vary in accordance with a specified schedule, but are in no event to be below the local market price. The purchase price of the commodity for each NFO member is to be paid directly to the individual member supplying it, usually at the time and place of delivery. Under the master contract each processor further

agrees, and is authorized to deduct from such purchase price and pay to NFO each month one percent (1%) of each member's gross sales to pay the member's dues and fees and an additional two percent (2%) of such gross sales, which is to be used to accomplish the disposal of surplus production as permitted by law and as directed by defendant's Board of Directors which is authorized to decide what constitutes a surplus. Supervision of such fund is to be determined by a special national convention of NFO to be held prior to the ratification of the first NFO master contract. Each master contract also provides:

"NFO hereby agrees to act and function as a procurement agent for the purpose of furnishing Processor with (the particular commodity involved) to be delivered at its plant or receiving station operated by Processor unless some other manner of delivery is mutually agreed upon. NFO members accept responsibility for delivery up to (distances varying with the commodity).

"For acting as a procurement agent for Processor, and for performing other services under this contract, Processor shall pay, within a (10) day period after the close of each month that this contract is in effect, to NFO, an amount equal to five percent (5%) of the gross sale of any (product) received from NFO members. One-half of one percent (½ of 1%) shall be used as determined by the National Board of Directors of the NFO for promoting the sale of (the particular commodity involved).

"Disposition of the balance of funds paid for services rendered will be determined by a special national convention of NFO; such convention to be held prior to the ratification of the first NFO contract."

The provisions for the payment of the five percent (5%) to NFO are alleged in Paragraph I of the amended complaint to violate Section 2 of the Clayton Act,

as amended by Section 1 of the Robinson-Patman Act (15 U.S.C. § 13(c)) which provides:

"(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

Defendant denies that it is an agent, representative, or other intermediary acting on behalf of the members within the meaning of Section 2(c) of the Robinson-Patman Act and alleges that by reason of Section 6 of the Clayton Act (15 U.S.C. § 17) and Section 1 of the Capper-Volstead Act (7 U.S.C. § 291), defendant and its members are to be considered collectively a single organization or association within the meaning of the antitrust laws of the United States. Defendant cites and relies on Sunkist Growers v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962), and Section 2 of the Clayton Act, as amended by Section 1 of the Robinson-Patman Act, including 15 U.S.C. § 13(c), and Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 376–377, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958). Consequently, defendant states, the five percent (5%) payments to be made by the processors are in legal effect, payments by buyers to sellers. As to plaintiffs' claim that the payments are to be received for acting as the procurement agent of the processor, defendant denies that in any of its activities it acts as an agent of the processors and states that it is elementary that whether an agency relation exists depends upon the relations of the parties as they, in fact exist, without regard to what they call their relationship. Defendant cites Restatement, Agency, § 1 p. 8; Anderson v. Valley Feed Yards, Inc., 175 Neb. 719, 123 N.W. 2d 839, 842 (1963). Defendant states that of greater importance, however, is the fact that violation of Section 1 of the Robinson-Patman Act (15 U.S.C. § 13 (c)) by payments to an agent requires payments by one party to an agent of *the other*. [Defendant's emphasis.] Defendant states that payments by a party to his own agent are not covered by the statute.

In framing the issues defendant took the position that the payments agreed to be made by the processors do not constitute the payment of "brokerage or other compensation, or any allowance or discount in lieu thereof," but are to be made for services actually rendered to the processors by NFO and its members collectively, and economic advantages resulting to the processors from the method of dealing under the master contracts when and if activated.

The purpose for which the payments are to be made is an issue of fact and must be determined on the basis of all of the circumstances prevailing in each case. *Cf*. Central Retailer-Owned Grocers, Inc. v. F.T.C., 319 F.2d 410 (7th Cir. 1963); Empire Rayon Yarn Co., Inc. v. American Viscose Corp., et al., 364 F.2d 491 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 704, 17 L.Ed.2d 541 (1967).

Citing and relying on these authorities, defendant argued that payments by sellers to buyers, or buyers to sellers for services actually rendered, or in consideration of savings or economic advantages to the party making the payments, inherent in the recipient's method of doing business, do not violate 15 U.S.C. § 13(c).

The foregoing substantially states the basic issues for decision under Count I of the amended complaint.

Count II of the amended complaint seeks a declaration that in acting as bargaining agent for its members defendant does not qualify for the immunities from the antitrust laws conferred by Section 6 of the Clayton Act (15 U.S.C. § 17), and Section 1 of the Capper-Volstead Act (7 U.S.C. § 291), and that absent such immunities, NFO master contracts and membership contracts violate Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).

Defendant argues that the immunity provided by Section 6 of the Clayton Act extends to all agricultural organizations instituted for the purposes of mutual self-help which are not conducted for profit and have no capital stock; that the Capper-Volstead Act extends this immunity to all associations, corporate or otherwise, of persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers acting together in collectively processing, preparing for marketing, handling and marketing their products in interstate and foreign commerce without regard to whether such associations have capital stock. Defendant acknowledges that in order to qualify under the Capper-Volstead Act such an association must be operated for the mutual benefit of the members thereof as such producers, and conform to one or both of the following requirements:

"First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or,

"Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

"And in any case to the following:

"Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members."

Defendant argued that under the undisputed facts defendant is a corporate association of persons engaged in the production of agricultural products as farmers, etc., instituted for the purpose of mutual self-help in collectively processing, preparing for market, handling, and marketing their products in interstate commerce; that it has no capital stock; that no member is entitled to more than one vote, and defendant does not pay dividends on stock or membership capital, and that defendant does not deal in the products of nonmembers. In this connection plaintiffs contend that defendant does not meet the requirements of the Capper-Volstead Act because it is not operated for the mutual benefit of its members as producers of agricultural products.

Chapter 504A, Section 26 of the Iowa Code, under which defendant is reorganized, provides in part as follows:

"No dividend shall be paid and no part of the income or profit of a corporation shall be distributed to its members, directors or officers. A corporation may pay compensation in a reasonable amount to its members, directors or officers for services rendered, may confer benefits upon its members in conformity with its purposes, and upon dissolution or final liquidation may make distributions to its members as permitted by this chapter, and no such payment, benefit or distribution shall be deemed to be a dividend or a distribution of income or profit."

Plaintiffs assert that the Iowa statute prohibits defendant from distributing to its members, except upon dissolution, any accumulated surplus from either the assessments or other receipts prior to the activation of the master contracts and that the same prohibitions apply to the one percent and two percent deductions to be made by the processors from payments to members for their produce and paid to defendant when the master contracts are activated. While Count II of the amended complaint makes no reference to the five percent payments, plaintiffs make the same contention with respect to the five percent payments of

the processors. Consequently, plaintiffs state that defendant is not operated for the mutual benefit of its members and therefore does not qualify for the immunity from the antitrust laws, including Sections 1 and 2 of the Sherman Act, as provided in Section 6 of the Clayton Act, and Section 1 of the Capper-Volstead Act.

Defendant claims that in essence the contention of the plaintiffs is that the members of NFO, although persons acting in the production of agricultural products, cannot act together in collectively processing, preparing for market, handling and marketing their products in interstate and foreign commerce as permitted by Section 1 of the Capper-Volstead Act, because of the limitations of their Articles of Association. To this argument defendant responds by again citing Sunkist Growers v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962), wherein the Court held that for antitrust immunity purposes the members were "in practical effect and in contemplation of the statutes one 'organization' or 'association' even though they have formally organized themselves into three separate legal entities." And further that the Supreme Court said in that case, "To hold otherwise would be to impose grave legal consequences upon organizational distinctions that are of de minimus meaning and effect to these growers who have banded together for processing and marketing purposes within the purview of the Clayton and Capper-Volstead Act(s). * * *" Defendant states that these statements are equally applicable to plaintiffs' contentions.

Defendant states that plaintiffs obviously cannot deny that defendant's operation as a mechanism for the collective marketing of the agricultural products of its members, is an operation for the mutual benefit of its members. Under the master contracts, defendant points out that the specified price for each commodity delivered by members to a processor is paid directly to each member except for the deductions of the one percent for dues and assessments, and the two percent for a surplus disposal fund which are to be paid by the processor to defendant.

Defendant states there is no requirement of Capper-Volstead that in order to qualify thereunder a corporate association of producers of agricultural products must be empowered to make periodic distribution to its members. Defendant argues that the only provision of that Act relating to distributions to members is the prohibition against payments of dividends on either stock or membership capital in excess of eight percent per annum. In support of this statement the defendant cites F.C.S. (Farm Cooperative Service) Bulletin No. 10, January 1958, published by the United States Department of Agriculture, wherein at page 171 it is stated, "It is not necessary for associations that operate under the Act to pay dividends in any amount unless they elect to do so. It is entirely a matter of choice with them."

As to the use of the annual dues being for the benefit of the membership, defendant states that under the membership agreement the annual dues and assessments must be used as directed by the board of directors to defray expenses incurred in carrying out a program of effectuating collective bargaining with processors and such other activities in the best interests of the membership of the organization to be determined by such board. Defendant states that obviously such use is for the mutual benefit of the members.

Likewise, as to the two percent of each member's gross sales which the processors agree to deduct and forward to NFO after the master contracts are activated, defendant claims that under the provisions of such contracts, such deductions must be used to accomplish the disposal of surplus production as permitted by law and as directed by defendant's national board of directors. It is asserted that neither of these deductions can, under the limitations as to their use,

constitute income or profit to NFO. Again defendant cites F.C.S. Bulletin 10, wherein it is stated:

"Money deducted from the returns from the sale of members' products may be used by the association only for the specific purpose for which deducted. In other words, if the marketing contract or a by-law of the association specifies that deductions shall be made for certain integral purposes, the deduction can lawfully be employed for no other purpose." U.S. Dept. of Agriculture, Farm Cooperative Service, Bulletin # 10, at 120 (1958).

It is argued that any unexpended balance of any fund derived either from the one percent or two percent could, of course, be distributed to members on dissolution as provided by Chapter 504A, Sections 26, 47–49, inclusive, of the Iowa Code. Further, that the corporation may be dissolved at any time two-thirds of the membership desires it as provided by Chapter 504A, Section 47.

It is the defendant's position that the same principles apply to the five percent (5%) payments to be made by the processors. One-half of one percent (.5%) is to be deducted from that amount to promote the particular industry, which the defendant says benefits the members as well as the processors, and that the remainder of the fund (4.5%) does not constitute income or profit of NFO as such. Under the contracts with the processors, it is argued, this fund is to be disposed of as the members determine at a special convention to be held before the first NFO contract is activated and the contract does not restrict in any manner the disposition to be made.

During the pretrial proceedings the defendant asserted that the evidence with reference to the Robinson-Patman issue would show that the services to be performed for which the payments are to be made are to be performed primarily by the members, although in part by NFO, and that the one percent covering

dues and assessments is intended to cover the NFO expense in this connection, and is all that NFO will receive as such. It is the defendant's position that under NFO's articles of incorporation all of NFO's activities are to be conducted on a non-pecuniary basis for the benefit of the members; that the 4.5% which under the contract is to be disposed of as the members shall decide at the convention, is the only source of recoupment by the members for the one percent and two percent deductions from the sale price of their commodities, and that NFO as such, has no beneficial interest in such fund, and that neither the Iowa statute nor NFO's articles of incorporation are applicable to its distribution. Also it is defendant's position that even if the Iowa statute required that distribution of the fund be postponed until dissolution, that would not deprive NFO and its members of the immunities conferred by the Clayton and Capper-Volstead laws since it still would be conducted for the mutual benefit of its members within the meaning of those statutes.

Finally, as to Count III of the amended complaint it appears that the only contention made which is not obviously involved in either Count I or Count II, appears to be that some additional significant aspect arises with respect to violation of Sections 1 and 2 of the Sherman Act because the processors, with whom the master contracts are entered into, are not themselves producers of commodities and consequently are not entitled to the immunities conferred on producers by the Clayton Act and the Capper-Volstead Act. It apears by Count III that the plaintiffs are attempting to bring this case under the principles stated by the Supreme Court in United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939), and Maryland and Virginia Milk Assn. v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960). These cases establish that neither the Clayton Act nor Capper-Volstead Act immunized contracts, combinations or conspiracies to restrain interstate commerce entered into between a farm co-

operative and other persons not themselves entitled to the benefit of such immunities, and further, that the immunities do not extend to predatory acts of the cooperative itself by means of attempts to monopolize some part of interstate commerce.

Admittedly defendant has entered into contracts for the sale of produce of its members with buyers who have no benefit of the immunities. Defendant states, however, that no facts are alleged with respect to any dealings with the processors except those specified in the contracts and the nature of the transactions is not changed by calling the relationship created a combination instead of a contract.

Defendant argues that the contracts with processors are nothing more than contracts for the sale of a commodity, and there is nothing in the antitrust laws limiting buyers with whom an association of producers can contract to sell persons qualifying for the immunities conferred by the Capper-Volstead Act. Defendant urges that the complaint is completely devoid of any allegations with respect to either restraint of trade, or monopolization of commerce, which are either the object of the processor contracts or any provisions thereof, or could reasonably result from carrying out such contracts. It is the defendant's position that in the absence of such allegations the mere fact the contracts are with outside persons cannot violate the Act.

Defendant says that even if the payments for services actually violated 15 U.S.C. § 13(c) as charged in Count I of the complaint, such violation would not support a charge of Sherman Act violation. Nelson & Sons, Inc. v. Rangen, Inc., 235 F.Supp. 393, 399 (D.C.Idaho 1964), citing Norville v. Globe Oil & Refining Co., 303 F.2d 281 (7th Cir. 1962). Defendant concludes by arguing that nothing with respect to the five percent (5%) payments has any bearing on Sherman Act violation.

From the foregoing there are three basic questions presented by the issues in this action:

(1) Whether the master contracts are illegal because the provision for the payment of five percent (5%) for services violates Section 2 of the Clayton Act, as amended by Section 1 of the Robinson-Patman Act (15 U.S.C. § 13(c)).

(2) Whether such contracts or any other activities of the defendant violate Sections 1 or 2 of the Sherman Act because defendant does not qualify as a Capper-Volstead association.

(3) Whether the master contracts or any activities of defendant shown by the evidence violate Sections 1 or 2 of the Sherman Act, even though defendant may qualify as a Capper-Volstead association because the immunities from the antitrust laws granted to such associations do not extend to such activities.

From the evidence, voluminous briefs, and extensive oral arguments, the Court makes the findings of fact and conclusions of law which accompany this memorandum.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court having considered the evidence and arguments of counsel and being duly advised in the premises, now makes the following findings of fact and states the following conclusions of law thereon:

### FINDINGS OF FACT

1. Each of the plaintiffs was at the time of the commencement of this action and is now a citizen and resident of the state shown opposite his name:

| | |
|---|---|
| Roland Waters | Wisconsin |
| Lawrence Walton | Illinois |
| Harry Basford | Minnesota |
| P. W. Petterson | Missouri |
| Keith Dare | Indiana |

2. Defendant (NFO) is a corporation originally organized in 1955 under Chapter 504 of the laws of the State of Iowa, entitled "Corporations Not For Profit" and is duly authorized to transact business in the State of Indiana. On Janu-

ary 7, 1969, defendant was reorganized under and pursuant to the provisions of Chapter 504A of the Iowa Nonprofit Corporation Act. Defendant's principal office is at Corning, Iowa, and it is and at all times since its organization has been a citizen of the State of Iowa.

3. Under Article III of its original Articles of Incorporation the objectives and purposes of defendant were stated to be "to promote agricultural benefits for the farmers of the United States of America, and to do any one or more or all of the acts, things and objects in any manner connected therewith or necessary, incidental, convenient or auxiliary thereto, including the promotion of the ideas to increase the benefits and standards of living of the farm population."

4. Defendant was originally organized following a meeting of farmers in Iowa for the purpose of obtaining contributions to send a representative to Washington, D. C. to explain farm problems. Initially its principal purpose was to serve as a medium through which farmers' problems could be heard through petitions to Congress, the Secretary of Agriculture and the President of the United States, requesting government programs that would assure 100% parity with specified floors for cattle and hogs. Defendant's leaders, however, soon concluded that efforts to obtain helpful legislation for farmers, were ineffective, due to the continuing drop in the numbers of farmers and the consequent weakening of their political position, and that the answer to their problems had to be sought through an effort to put farmers in a position of sufficient economic strength to offset the economic strength of processors of farm products, so that farmers would no longer be forced to accept whatever prices the buyers were willing to pay. For that purpose defendant's 1957 national convention adopted a resolution authorizing its representatives to work out a plan of collective bargaining for its members.

5. In 1958 as a part of working out such a plan of collective bargaining Article III of defendant's Articles of In-

corporation was amended by adding a second section, as follows:

"*Section 2.* An object and purpose of this organization is to bargain collectively on a non-pecuniary basis as a service to its members for the sale of their agricultural commodities, or any of them, the prices to be paid therefor and the terms and conditions governing the sale, delivery and payment therefor, and all matters arising therefrom in connection therewith or incidental thereto; but all such activities shall be conducted on a non-pecuniary basis, for the benefit of its members."

and a form of membership agreement to be entered into between NFO and its members was prepared. Said agreement provides in part that the signing member authorizes NFO and its agents or representatives to act as such member's exclusive representative in collective bargaining in respect to all commodities marketed from the member's farm not covered by other marketing agreements at the date of the execution of the agreement, to enter into contracts with processors of such products covering the selling prices and other conditions of disposal, and to establish marketing procedure. The authorization is irrevocable for a period of three years, and automatically renewed for like periods unless terminated by written notice to NFO at least 10 days prior to the expiration of any three year period. Such authorization is stated therein to be made pursuant to the provisions of the Capper-Volstead Act (7 U.S.C. §§ 291, 292). So far as here pertinent the membership agreement further provides:

"(a) Until such time as a contract has been consummated with the processor of a commodity or a marketing procedure is established and ratified in accordance with the membership agreement a member shall be free to market his commodity as he chooses.

(b) When a contract has been consummated in accordance with the terms of the membership agreement covering a member's commodity he incurs an assessment of 10% of the gross

sales as liquidated damages if he sells to any other processor than the one specified in the agreement.

(c) No contract consummated with a processor can become binding or effective until ratified by a two-thirds vote of members in a marketing area, who have signed NFO contracts for the commodity, attending a meeting called for that purpose by the Marketing Area Bargaining Committee, and has been approved by the NFO Board of Directors.

(d) The President and Board of Directors shall establish marketing areas for each commodity based on the area of supply of key markets. Bargaining with processors in each marketing area shall be done by elected Marketing Area Bargaining Committees under the supervision of the NFO Executive Board and with the assistance of the NFO National Commodity Departments. When, in the opinion of the NFO Board of Directors sufficient commodities have been signed covering a specific commodity to be effective in collective bargaining the President shall call a meeting of the members of County Bargaining Committees representing the commodity in each zone of the marketing area for the purpose of electing a member of the Area Bargaining Committee, and an alternate. Each Market Area Bargaining Committee is to consist of seven members, one from each zone of the area.

(e) By a two-thirds vote of NFO members attending county meetings of which notice has been given by the County Bargaining Committee at least ten days in advance of the time, place and purpose, an additional surplus disposal amount shall be checked off at the processor level, either for buying farm products and channeling to needy worthwhile organizations, or to form welfare agencies or others the NFO may feel is necessary to keep production in balance with consumption.

(f) The membership dues of NFO shall be $5.00 per year, or such amount as may thereafter be established by NFO, and a member shall be assessed $20.00 at the time of signing the contract, and each year thereafter, which shall be used as directed by the National Board of Directors to defray expenses in carrying out a program to effectuate collective bargaining with the processors and other activities in the best interest of the NFO membership to be determined by the NFO Board of Directors.

(g) When a marketing agreement has been consummated by NFO covering a member's commodity it shall provide that the processor check off 1% of the gross sales of the commodity for NFO which shall then become the member's dues and replace the dues and assessments otherwise prescribed in the agreement.

(h) NFO shall not become legal owner or engage in business activities but must remain within the framework of a service organization bargaining for its members who have signed marketing contracts."

6. Under the NFO bylaws the membership of NFO is open to all persons regardless of race, creed, or color who are engaged in the production of agricultural commodities, except that no person involved in or who has ever been involved in Communist or Fascist activities is eligible for membership. Membership is limited to farmers or farm owners and anyone who ceases to farm, automatically ceases to be a member, unless he quits farming because of election to NFO office or is employed by NFO. No individual can hold any elective office or head any department unless a major portion of his income is derived from farming at the time he accepts an NFO office or appointment. NFO has no members other than agricultural producers and is controlled by and for such producers.

7. Each of the plaintiffs is engaged in the production of agricultural products and as such is qualified for membership in, and is a member of defendant.

8. As a part of functioning as a representative of its members in collective bargaining, defendant has entered into contracts with various processors and buyers for the sale by its members of their agricultural commodities denominated "master contracts" and has sought and seeks to enter into additional master contracts with processors and buyers. Products with respect to which "master contracts" have either been entered into, or sought to be entered into, by NFO are cattle, pork, soybeans, edible beans, milk for Class I purposes and milk for manufacturing purposes. The principal commodities for which "master contracts" are sought by NFO are cattle, pork, and milk for Class I and for manufacturing purposes.

9. So far as here pertinent the principal provisions of the master contract for cattle are as follows:

"(a) NFO agrees to act and function as a procurement agent for the purpose of furnishing the processor with cattle delivered at its plant or receiving stations operated by processor unless some other manner of delivery is mutually agreed upon. NFO members accept responsibility for delivery up to 100 miles.

(b) The Processor shall be supplied and NFO agrees to have delivered to processor a specified number of cattle of various specified grades at specified prices during each twelve month period the contract is in effect. Members supplying cattle under that contract are to be paid directly by the processor at the delivery point.

(c) The processor agrees and is authorized to deduct 1% from each member's gross sales at the time the member is paid, to be placed in a custodial fund and forwarded to NFO to pay the member's NFO dues and fees.

(d) The processor agrees and is authorized to deduct an additional 2% at the time the member is paid which is to be placed in a custodial fund and forwarded to NFO to be used to accomplish the disposal of surplus production as permitted by law and as directed by the National Board of Directors, which is to decide what constitutes a surplus. Supervision of the surplus disposal fund is to be determined at a special national convention of NFO to be held prior to ratification of the first master contract.

(e) For acting as a procurement agent for the processor, and for performing other services under this contract the processor agrees to pay to NFO within 10 days after the close of each month the contract is in effect, an amount equal to 5% of the gross sales of cattle received from NFO members. One half of one per cent shall be used as determined by the National Board of Directors of the NFO for promoting the sale of meat and meat products. Disposition of the balance of funds paid for services rendered will be determined by a special national convention of NFO to be held prior to the ratification of the first NFO contract.

(f) The processor agrees to consult with NFO from time to time for the purpose of promoting the orderly delivery of cattle to the processor by NFO members.

(g) The processor has the responsibility of advising NFO from time to time of consumer demands and market requirements and NFO agrees to initiate an educational program to promote the production of a desired quality product.

(h) It will be necessary for NFO in the interest of efficiency in marketing and elimination of unnecessary transportation to supply the processor's needs from the areas closest to his plant or plants whenever possible. All processors signing a contract within thirty days after it is presented to them are to be supplied as nearly as possible on an equal basis from the

major producing areas closest to their plant or plants. Processors signing at a later time may be supplied from more distant areas.

(i) The contract is to be in force and effect from the date of its activation for a full twelve months period and will be automatically renewed for like periods unless either party gives notice of termination by registered mail of its desire to terminate the contract, not less than sixty days before the termination of the initial or any renewal period.

(j) NFO will not activate the contract until it is marketing or in a position to market under the membership agreement at least 60% of the total cattle slaughtered in the major cattle producing states of Illinois, Indiana, Iowa, Ohio, Michigan, Minnesota, Missouri, Wisconsin, Kansas, Nebraska and Colorado."

The contract form provides for initial signature by NFO by its Director for the commodity, and the Chairman of the Area Bargaining Committee, subject to ratification by members affected as provided in the membership agreement.

10. So far as here pertinent, the provisions of the master contracts for other commodities are substantially similar with the exception of the provision for activation. The master contract for milk is to be activated thirty days after NFO has signed contracts with processors who have contracted to bottle or have bottled in the previous year an amount of milk equal to 60% of the average annual number of pounds of milk bottled in Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, Iowa, Missouri, Kansas, or Nebraska, during the prior three year period. The activation provision in master contracts with respect to soybeans and edible beans is substantially the same as in the master contracts for milk except that the area specified is the United States instead of a multistate area.

11. Master contract forms were first prepared in 1961. Since that time except as stated in Finding No. 12, NFO has continuously sought to obtain a sufficient number of members, and/or to enter into a sufficient number of processor contracts to activate master contracts. Up to this time NFO has never been able to obtain a sufficient number of members to activate master contracts for livestock, or a sufficient number of processor contracts to activate master contracts with respect to any other commodity for which such contracts are offered and there is no basis in the record for any determination either when or whether NFO will obtain either a sufficient number of members to activate master contracts to supply livestock or a sufficient number of processor contracts to activate master contracts for other commodities.

12. Because of the difficulty of obtaining a sufficient number of members or a sufficient number of processor contracts to activate master contracts, NFO has substantially reduced its attempts to obtain master contracts with respect to its principal commodities of livestock and milk during the past two or three years, and instead has attempted to, and has, during that period negotiated contracts with processors therefor which are termed "supply contracts." Under a "supply contract" the processor contracts with NFO for the purchase of a specified daily or weekly quantity of a commodity for a period of ninety days, which is automatically renewed for like periods unless terminated by notice. While such a contract must be ratified by a vote of the members desiring to participate, no member is thereby legally obligated to participate and participation is on a wholly voluntary basis. No fixed price is specified and the price is normally the market price although it may be computed with respect to the price at a particular market or a formula with respect thereto. While some coordinating services are rendered under supply contracts such as maintaining an NFO representative in the processor's plant for coordination of shipments, such services are of a minor character as com-

pared with the services of NFO and its members required under the master contracts, if and when activated, and no compensation for services as such is paid by the processor. Approximately only 15% of the NFO members are presently selling farm products under NFO supply contracts. NFO has not abandoned its objective of ultimately activating master contracts, and considers the supply contracts as an intermediate step which will presently enable members to sell their farm produce under contracts negotiated by NFO if they so desire, and establish contacts with processors which NFO hopes will eventually be helpful in negotiating master contracts in the future.

13. Processors of livestock procure their supplies of live animals by some or all of the following methods:

(a) Some processors employ salaried buyers who continuously travel about in automobiles through country areas and purchase such livestock as they find to be available at farms, country auctions, or other similar sources, which are then shipped to the plant.

(b) Some processors maintain permanent buying stations or points in country areas where they own facilities and maintain full-time salaried employees that remain at the plant that purchase livestock brought into the station and ship to the plant.

(c) Some processors buy at major terminal markets located in large cities where livestock is brought in from many points in large volume either by producers or direct or indirect purchasers from producers and sold either directly to processors or dealers located at the terminal market who in turn resell to processors who transport the purchased livestock to their respective plants.

(d) Some processors purchase through dealers who maintain permanent stations with facilities, and full-time salaried employees in country areas who purchase the livestock on their own account and resell to processors on orders received.

(e) Some processors purchase through order buyers who purchase for the account of the processor from any source available and are compensated for their services by the payment of a commission.

Individual processors frequently utilize two or more, or all of the foregoing methods of purchasing livestock. The proportion of livestock purchased by processors at terminal markets, however, has been steadily declining for many years.

14. Under the NFO master contracts for livestock the livestock is to be delivered by NFO members directly from the farms to the processor's plant, under a single annual contract for a supply of specified sizes, grades and weights without the necessity of use by the processor of any existing procurement methods in obtaining the livestock supplied by NFO members. In order to perform the services necessary to carry out such contracts it will be necessary for NFO to establish an extensive coordinated structure, including a large additional staff at the national level highly trained to sort and grade, and an elaborate communications structure, which will combine services of NFO representatives and the members. The members will have to perform through cooperation the services of collectively marketing their products. NFO's function in the structure will be that of coordinating the system. It will be necessary to maintain in each area a continuing inventory of the production of members expected to be available at particular times. This will require an initial inventory at least six months prior to the time the expected production must be available, and regular subsequent inventories to keep such information current, which will subsequently be required to get to the point of the specific week or day each individual member's production will be available. A week ahead of the time deliveries are required a defin-

ite number of live animals or a definite quantity of other commodities will have to be scheduled for each processor. Coordination of all transportation will be necessary in which members will have to participate in arranging for shipments in full truckloads, so that after the sorting, grading and assembly of the livestock, a specific full truckload or number of full truckloads will go to each particular processor, since it is not contemplated that quantities for different processors be combined in a single truckload.

15. The method of operation contemplated and intended under NFO master contracts with respect to livestock will, if and when such contracts are activated, result in various savings by, and economic advantages and benefits to, processors who have signed such contracts, including the following:

(a) Each processor will have an assured minimum annual volume of livestock of the grades and sizes and in the quantity he specifies in his contract delivered in an even flow at his plant. Under existing procurement methods a processor can neither be assured of always obtaining the desired volume nor of obtaining an even flow. Receiving his supply in an even flow enables the processor to operate his plant more efficiently and the assurance of desired volume enables him to utilize maximum capacity.

(b) The processor will always be able to obtain the particular sizes and grades desired without having to purchase additional sizes and grades which he does not want, which is often necessary under existing procurement methods.

(c) A processor buying under an NFO master contract can avoid the necessity which exists under present procurement methods of buying livestock each week to be carried over week-ends in order to have on hand a sufficient quantity to be able to oper-

ate at full capacity on the Monday following. The carrying of livestock over week-ends involves substantial expense to the processor in maintenance of facilities, services of employees, and feed expense, as well as losses incurred through tissue shrinkage and bruises, all of which will be unnecessary for processors operating under NFO contracts.

(d) Delivery directly from the farm to the packer's door will minimize losses of the processor on account of bruises that result from multiple handling and tissue shrinkage resulting from delayed delivery, that occur when existing procurement methods are required to be utilized.

(e) Under existing procurement methods the processor has a substantial communication expense whether he utilizes salaried buyers traveling by automobiles, maintains his own buying stations, buys from dealers at terminal markets, or buys through order buyers. Under an NFO master contract his only necessary contact is with a particular NFO representative, which will result in substantial savings in communication expense.

(f) Operation under a master contract will eliminate all transportation expense within the radius specified in the contract with respect to the particular commodity, and for most plants a high percentage of their supply will be within the radius in which NFO members are obligated to deliver. By buying under an NFO master contract substantially all of the processor's procurement expense with respect to the livestock purchased will be eliminated or substantially reduced.

(g) The provision of the master contracts with respect to the establishing of a fund at the expense of NFO members for the handling of surplus disposal to the extent permitted by law either for buying farm products and

channeling to needy worthwhile organizations or to form welfare agencies or others which NFO may find necessary to keep production in balance with consumption as provided in Article VIII, Section 5 of the membership agreement will benefit processors as well as members.

(h) The provision of the master contract requiring NFO to initiate an educational program to promote the production of a desired quality product will be of benefit to processors entering into master contracts.

16. The services to be rendered by NFO and its members collectively with respect to the sale and delivery of commodities other than livestock, and the economic advantages and benefits resulting to the processor therefrom are of the same general character, subject to variations as required by the nature of the commodity, as those to be rendered under master contracts for livestock. In the case of master contracts for milk large volume and an even flow will enable milk processors to effect substantial cost savings in the operation of their plants.

17. The payments of 5% of the gross sales of NFO members to be made by processors under master contracts with the exception of the .5% to be used by NFO for promoting the sale of the particular commodity which will benefit such processors, are for the sole purpose of compensating the members of NFO for the services rendered by them in collectively performing market procurement and coordinating services for the processors and on account of the savings and economic advantages and benefits to the processors in their business operations, inherent in NFO's method of doing business, expected to result therefrom. There is no evidence that such payments are for rendering a broker service to the processors or are to be in lieu of brokerage, or are related in any manner to any saving of the processors based on the partial or total elimination of brokerage services.

18. The only payments to be retained by NFO on account of services rendered by it under the master contracts are the 1% of gross sales to be deducted by processors from the amount of the gross sales of NFO members, which are to pay each member's NFO dues and fees, and under the membership agreement must be used only as directed by the NFO Board of Directors to defray expenses of collective bargaining with processors, and other activities in the best interest of the membership of the organization as determined by the NFO Board of Directors.

19. The intention and purpose of the provision in the master contracts that disposition of the balance of funds paid for services rendered, after deducting .5% to be used to promote the sale of the particular commodity, is to be determined by a special national convention of NFO to be held prior to the ratification of the first NFO contract, is to leave solely to the NFO membership the unrestricted right to dispose of such balance in any manner such membership may determine at such convention.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject-matter of the action.

2. Notwithstanding the provisions of the respective master contracts with respect to NFO acting and functioning as a procurement agent for the purpose of furnishing the processor with cattle, hogs, soybeans, dry edible beans or milk, the services to be rendered by the defendant under such contracts are not to be rendered as an agent of the processor but solely on behalf of its members as an association of persons engaged in the production of agricultural products as farmers, ranchmen, or dairymen, acting together in collectively preparing for

market, handling, and marketing their agricultural products.

■ 3. Section 2(c) of the Clayton Act (15 U.S.C. § 13(c)) has no application to the 5% payments required under the master contracts to be made by processors and the provision for such payments neither violate the statute nor render either the master contracts or defendant's membership contracts illegal.

■ 4. Defendant is a corporate association of persons engaged in the production of agricultural products as farmers, ranchmen and dairymen acting together in collectively preparing for marketing, handling and marketing their products in interstate commerce, within the meaning of Section 1 of the Capper-Volstead Act (7 U.S.C. § 291). It. is operated for the mutual benefit of the members thereof within the meaning of said Act; and otherwise conforms to all the requirements of said Act. Consequently defendant is entitled to all the immunities from the antitrust laws of the United States granted by said Capper-Volstead Act and by Section 6 of the Clayton Act (15 U.S.C. § 14) to such associations.

■■ 5. It is not necessary in order to qualify as an association under the Capper-Vostead Act that such an association either make or be authorized to make distributions to its members, of its income or property, by way of dividends or otherwise, but the balance of the 5% payments to be made to NFO by the processors after deducting the .5% to be used by NFO for promoting the sale of the particular commodity to which such payments relate, are not under the provisions of the master contracts either income or property of NFO, and neither the provision of the Iowa statute under which defendant is organized prohibiting the payment of any dividend or any distribution of income or profit prior to dissolution or final liquidation, nor the restriction in the Articles of Incorporation prohibiting any dividend or distribution of NFO's property prior to dissolution, has any application to the 5% payments or any part thereof, or restricts in any manner the right of its membership to make any disposition of said balance it may determine to make at the special convention to be held for the purpose of such determination as provided for in said contracts.

■ 6. The defendant has not either by entering into master contracts with processors or by seeking to enter into such contracts, or by anything done or to be done thereunder, or otherwise, violated either Section 1 or Section 2 of the Sherman Act.

7. The law is with the defendant as to each of the three paragraphs of plaintiffs' amended complaint and their action should be dismissed with prejudice as to each such paragraph.